900 A.2d 259

**8621 LIMITED PARTNERSHIP**

v.

**LDG, INC.**

No. 0058, Sept. Term, 2005.

Court of Special Appeals of Maryland.

June 6, 2006.

Maury S. Epner (Michael G. Campbell, Joseph P. Suntum, Miller, Miller & Cancy on the brief,) Rockville, MD, for appellant.

Robert E. Grant (Elsie L. Reid, Furey, Doolan & Abell, L.L.P. on the brief,) Chevy Chase, MD, for appellee.

Panel: DAVIS, SALMON and ADKINS, JJ.

ADKINS, J.

In 1989, appellant 8621 Limited Partnership (8621) and appellee LDG, Inc. (LDG) jointly purchased a parcel of Silver Spring commercial real estate, known as the Wolfe Property. The Wolfe Property lies between properties known respectively as the Chambers Parcel and the LDG Parcel. Although LDG owned and controlled the LDG Parcel, 8621 did not own the Chambers Parcel. Rather, at that time, the Chambers Parcel was owned by a partnership that is not a party to this litigation, but whose principals include several of the principals in 8621.

The plan was to subdivide the Wolfe Property into two lots, one to be owned by LDG and the other by 8621.[1] Among the terms of the Wolfe Property Joint Venture Agreement that 8621 and LDG entered into is the one that lies at the heart of

---

1. The Joint Venture Agreement was executed by three individuals collectively designated "the Associates" because 8621 had not yet been formed. 8621 is the successor-in-interest to the Associates. For convenience, we shall refer to 8621 as a party to the Joint Venture Agreement.

this dispute—paragraph 10 regarding development of the two subdivided lots:

In the event the parties acquire the Wolfe Property, any site plan for the Wolfe Property or the LDG Parcel or the Chambers Parcel shall be done in conjunction with each other and **if access from the Chambers Parcel to Fenton Street and from the LDG Parcel to Cameron Street can be reasonably provided without interfering with the development of each parcel, the site plan shall contain such access.** In addition, if access from the Wolfe Property to Colesville Road or from Colesville Road to the Wolfe Property through the LDG Parcel is sought by LDG and granted, then [8621] shall be entitled to said access from their parcel to Colesville Road at no additional cost to [8621] provided such access does not interfere with the development of the LDG Parcel. (Emphasis added.)

After acquiring the Wolfe Property, 8621 and LDG jointly demolished the commercial buildings on it and used the site as a parking lot for many years. During this time, LDG's president E. Brooke Lee, III, worked together with 8621's managing partner, Richard Cohen, to successfully oppose a threatened taking of the Wolfe Property by the State of Maryland.

Eventually, 8621 and LDG subdivided the Wolfe Property into two lots, both of which are in the midst of a commercial block. These lots have direct street access only onto a heavily trafficked portion of Georgia Avenue. They have greater development potential, and therefore greater value, if another indirect route is made available to side streets surrounding that block.

LDG's lot is located adjacent to separate property owned by LDG (the LDG Parcel discussed above), which has side street access onto Colesville Road and Fenton Street. The lot allocated to 8621 is located next to the Chambers Parcel, which has side street access onto Cameron Street. Thus, in order to access Cameron Street, LDG would need to cross the 8621 lot and the adjacent Chambers Parcel. In order to

access Fenton Street or Colesville Road, 8621 would need to cross the LDG lot and the adjacent LDG Parcel.

During and after the subdivision process, Lee allegedly assured Cohen that 8621 would be given access from its subdivided lot to either Fenton Street or Colesville Road. When Brooke Lee died, his brother Blair Lee became president of LDG. Under Blair Lee's management, LDG disclaimed any interest in seeking access to Cameron Street across the 8621 lot and Chambers Parcel. Moreover, LDG took the position that it was not obligated to provide 8621 access to either Fenton Street or Colesville Road across its properties.[2] LDG, through Blair Lee, demanded that 8621 execute deeds conveying the two subdivided lots of the Wolfe Property to the individual joint venturers in fee simple, without any access easement. 621 refused to do so.

LDG sued 8621 for declaratory and other relief, seeking an order requiring 8621 to execute a deed free and clear of any encumbrances. It also sought dissolution of the Joint Venture.

Ten months after this litigation began, the partnership that owned the Chambers Parcel sold it to an unrelated third party. A month later, 8621 counterclaimed, seeking specific performance of the access provision in paragraph 10 of the Joint Venture Agreement and a declaration that 8621 is entitled to "access from the Chambers Parcel to Fenton Street if such access can be reasonably provided without interfering with the development of the subject parcels" (Count I). Alternatively, 8621 sued for breach of the Joint Venture Agreement (Count II).

LDG moved for summary judgment on its complaint, and to dismiss or for summary judgment on 8621's counterclaims, on the ground that the access provision in the Joint Venture Agreement is an unenforceable "agreement to agree." Alter-

---

2. LDG disputes that E. Brooke Lee, III remained committed to providing 8621 access through the LDG parcel, pointing out that the deeds 8621 refused to sign had been prepared under the direction of Mr. Lee before his death.

natively, LDG argued, the sale of the Chambers Parcel constituted a breach of the Agreement, and rendered performance of the mutual access clause impossible, thereby releasing LDG from any obligation it may have had thereunder.

8621 opposed the motions, arguing that the access clause is enforceable, that the Joint Venture had not run its course because no access had been provided, and that the post-lawsuit sale of the Chambers Parcel did not materially breach the Agreement or otherwise excuse LDG from liability. 8621 later amended its counterclaim to add another count seeking damages for breach of fiduciary duty, as an alternative to the declaratory and injunctive relief sought in Counts I and II.

After a hearing on LDG's motions, the Circuit Court for Montgomery County issued a written decision, concluding that the access provision of the Joint Venture Agreement "lacks material terms sufficient to create an enforceable obligation [ ] as to joint development or reciprocal access, *i.e.*, it is, in short, an agreement to agree in this respect." Alternatively, even if the access provision is sufficiently definite to be enforceable, the court ruled that "the sale of what the parties have referred to as the 'Chambers Parcel' constitutes a material breach of the agreement" and "renders performance of Paragraph 10, as the requirements of that paragraph are characterized by . . . 8621 . . . impossible[,]" which in turn "excus[ed] further performance by . . . LDG."

The circuit court held that, under the Joint Venture Agreement, LDG and 8621 are required to convey the appropriate subdivided lots to each other "in fee simple absolute, free and clear of any encumbrances, in dissolution of the Wolfe Property Joint Venture." It ordered 8621 and LDG to execute and deliver deeds, and further declared that LDG is not obligated to provide information regarding its development plans, to work in conjunction with 8621 in such development, or to provide 8621 with access to Fenton Street.

 8621 noted this interlocutory appeal,[3] then argued to the motion court that it lacked jurisdiction to proceed on LDG's motion to dismiss the remaining breach of fiduciary duty count of 8621's counterclaim due to the pendency of this appeal. The court stayed proceedings on that counterclaim pending disposition of this appeal, without ordering 8621 to post any bond.

8621 appeals that interlocutory judgment, raising two issues:

I. Whether the access provision in the Joint Venture Agreement " 'is so vague and indefinite as to be unenforceable'?

II. Whether, after LDG spurned access from 8621 LP and filed suit, its reciprocal obligation to provide access to 8621 LP was excused by the post-suit sale of the property over which the unwanted access otherwise would have been provided?"

LDG cross-appeals the denial of its motion to dismiss the damages counterclaim, and the stay without bond pending this appeal.

We shall hold that the court erred in concluding, as a matter of law, that the access provision in the Joint Venture Agreement is an unenforceable agreement to agree. In addition, we conclude that, although sale of the Chambers Parcel during this litigation prevents 8621 from performing its promise to provide LDG a side street access route across its property, a jury could conclude that 8621 was excused from that obligation by LDG's prior breach of its obligation to provide access to 8621. Summary judgment was inappropriate due to these material disputes about the meaning of the access clause and the respective performances by LDG and 8621.

---

**3.** Interlocutory orders directing the conveyance of real property interests are appealable. *See* Md.Code (1974, 2002 Repl.Vol.), § 12–303(3)(v) of the Courts and Judicial Proceedings Article (CJP).

## DISCUSSION

### I.

### 8621's Appeal: The Access Clause

8621 complains that the circuit court erred in focusing solely on the site planning clause in Paragraph 10 and failing to give any effect to the ensuing access clause. It posits that, even assuming *arguendo* that "the 'site plan' clause of paragraph 10 was too indefinite to be unenforceable, the same manifestly cannot be said of the 'access' clause." Most significantly, no aspect of the agreement to provide reasonable access was reserved for future agreement, and there was mutual consideration for the negotiated agreement to provide side street access in both north and south directions, in order to maximize the development potential of each subdivided lot.

LDG responds that the court correctly ruled as a matter of law that both the site planning and access provisions were "merely aspirational." In LDG's view, the access clause cannot possibly be "decoupled" from the site planning clause, either grammatically or logically. Moreover, material terms are missing from both clauses:

> Nothing in paragraph 10 sets forth whether the purported joint development should be commercial, residential or mixed-use, or provide for office space, retail space, a restaurant or a movie theater of all four. There is no provision for how the parties will select a site planner or planners, or bear the cost of doing so. There is no provision for whose aesthetic or practical sensibilities will govern the site planning; in fact, there is no mechanism at all for resolving disputes between the joint venturers if they were to disagree.

> \* \* \*

> Who would determine whether reciprocal access " 'can reasonably be provided,' or if somehow provided, whether such access would be 'interfering with the development of each

parcel?'.... What does access mean? Vehicular, pedestrian, a bike path?"

According to LDG, the fatal absence of essential terms is underscored by 8621's attempt to use extrinsic evidence to supply them. LDG contends that, if the contract leaves nothing material to be decided, as 8621 asserts, then there should be no need to resort to the information regarding the parties' course of dealing that is supplied in the affidavit of 8621's managing partner, Richard Cohen. .

## A.

### Enforceability Of The Access Clause

#### 1.

### Enforcement Of Future Performance Terms

In Maryland contract law, "the primary source for determining the intention of the parties is the language of the contract itself." *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 290–91, 674 A.2d 106, *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). Contracts are interpreted objectively, which "means that the clear and unambiguous language of a written agreement controls[.]" *First Union Nat'l Bank v. Steele Software Sys. Corp.,* 154 Md.App. 97, 171, 838 A.2d 404 (2003), *cert. denied,* 380 Md. 619, 846 A.2d 402 (2004).

But language in a contract can be "ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person." *Maslow v. Vanguri,* 168 Md. App. at 318, 896 A.2d 408, 2006 WL 907775, *10 (2006). "To determine whether a contract is susceptible of more than one meaning, the court considers 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.' " *Id.* (citation omitted).

"In construing a contract, each clause must be given effect if reasonably possible." *Arundel Fed. Sav. & Loan v. Lawrence,* 65 Md.App. 158, 165, 499 A.2d 1298 (1985).

"[C]ourts are reluctant to reject an agreement, regularly and fairly made, as unintelligible or insensible." *Quillen v. Kelley,* 216 Md. 396, 407, 140 A.2d 517 (1958). Because the "law does not favor, but leans against, the destruction of contracts because of uncertainty[,] ... courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained." *Id.*

Nevertheless, " '[a] court cannot enforce a contract unless it can determine what it is.' " *See First Nat'l Bank v. Burton, Parsons & Co.,* 57 Md.App. 437, 450, 470 A.2d 822, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984) (quoting 1 *Corbin on Contracts* § 95). "An agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable." *Maslow,* 168 Md.App. at 322, 896 A.2d 408, 2006 WL 907775, *12. Therefore, the parties to a contract

> "must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract."

*First Nat'l Bank,* 57 Md.App. at 450, 470 A.2d 822 (quoting Corbin, *supra* ).

Because courts may not cure indefinite or vague contract language by supplying missing contract terms or definitions, "commercial agreements to negotiate upon terms and conditions to be decided are unenforceable." *Id.* at 448, 470 A.2d 822; *see Horsey v. Horsey,* 329 Md. 392, 419–20, 620 A.2d 305 (1993). For example, when essential elements of a complex real estate development project are reserved for the future agreement of both parties, there may be no enforceable deal. *See id.* at 448–50, 470 A.2d 822.

In *Peoples Drug Stores, Inc. v. Fenton Realty Corp.*, 191 Md. 489, 492, 495, 62 A.2d 273 (1948), the Court of Appeals declined to enforce a letter "agreement" regarding construction of a leased store building. The letter included building dimensions and general specifications, rent, and a lease term, but stated that " 'the lease itself as to form will be similar to those currently and recently drawn by your company but shall be subject to the approval of the undersigned.' " *See id.* at 492, 62 A.2d 273. The Court held that the terms in the letter were not binding, because the parties did not demonstrate a mutual intent "to conclude their contract by their correspondence," but merely "settl[ed] the terms of an agreement into which they proposed to enter after the particulars were completely adjusted." *Id.* at 495, 62 A.2d 273.

Lack of specific terms, however, does not necessarily make a particular clause in a contract meaningless. *See First Union*, 154 Md.App. at 172, 838 A.2d 404. There are many types of enforceable commercial contracts that deliberately select an "open" term of performance such as those that require the parties to use "best efforts," "good faith," or "reasonable efforts." *See id.; see generally* Kenneth A. Adams, *Understanding "Best Efforts" and Its Variants (Including Drafting Recommendations)*, 50 No. 4 Practical Lawyer (Aug.2004) (examining "what best efforts and its variants mean when not defined by contract; and how courts go about determining whether a party has made the required efforts").

"Best efforts clauses and other terms that require a party to use reasonable prudence in performance are obviously like a negligence rule." Mark P. Gergen, *The Use of Open Terms in Contract*, 92 Columbia L.Rev. 997, 1000 (1992). These types of "[o]pen terms are used when it is too costly to plan performance *ex ante* in the contract and vulnerability to opportunism makes a party unwilling to submit to unconstrained *ex post* bargaining over performance." *Id.* Open term performance standards motivate businesses to contract "[w]hen accomplishing a certain goal is not entirely within [the promisor's] control[.]" *See* Adams, *supra*, at 12. Although

the parties may not be willing to enter into a contract that creates an "absolute duty to accomplish that goal," they can agree on both the desire to achieve the stated goal, and the obligation to use good faith and reasonable diligence in an effort to achieve it. *See id.*

We applied these principles to enforce a best efforts clause in *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md.App. at 172–75, 838 A.2d 404. In that case, we upheld a jury verdict in favor of a title search company on a breach of contract claim, rejecting an analogous "agreement to agree" challenge by a bank that contracted to use its "best efforts" in referring its business to the title company. *See id.* at 175, 838 A.2d 404.

Of significance to this appeal, we explained in *First Union* why the "best efforts" referral clause was enforceable even though it lacked specific language requiring the bank to direct a certain percentage of its title transactions to the title company. *See id.* at 174–75, 838 A.2d 404. We held that commercial businesses are free to enter into mutually binding promises that define their future business relationship by selecting a variety of "non-specific contractual standards" for measuring each party's performance of its contractual obligation.

**When contracting parties enter business relationships that cannot be specifically defined in advance, they set up standards that will allow a neutral decision maker some basis for decision.** In doing so, they recognize that there is a certain murkiness to exactly how that standard will be applied to the business circumstances that eventually exist.

This uncertainty, however, does not preclude formation of an enforceable contract if that is what the parties intended. **Thus, best efforts clauses generally have been held enforceable because the parties intend to be bound, and there is an articulated standard.**

*Id.* at 173, 838 A.2d 404 (emphasis added and citation omitted). For these reasons, we recognized that "open term" performance contracts are premised upon a mutually enforceable

agreement that the non-specific standard selected by the parties will be interpreted and applied by a fact-finder "after the fact," based on all the circumstances surrounding the parties' course of dealing. *See id.* at 174, 838 A.2d 404. *See also* Adams, *supra* ("Determining the benchmark for sufficient effort may include: [p]romises made during contract negotiation; [i]ndustry practice; [p]ractice with respect to other contracts; [h]ow the promisor would have acted if the promisor and promisee had been united in the same entity").

In *First Union,* the contract and extrinsic evidence supported the jury verdict in favor of a title company known as 3S.

**A rational juror could infer that the parties had a meeting of the minds and therefore met the requirement of mutual assent because they understood that First Union was undertaking to be reasonably diligent** in referring business to 3S. They agreed to the standard of "best efforts," on a non-exclusive basis. They did not necessarily agree on exactly what volume of referrals would meet that standard. **First Union clearly had some discretion in determining what was diligent. But it also had an obligation of good faith in determining that volume. Thus, although diligence is at the core of best efforts, First Union also has an obligation to act in good faith. The jury may have determined that First Union, under the circumstances, did not act in good faith in exercising diligence,** even though the best efforts clause did not create a specific obligation to direct a certain percentage of First Union's transactions to 3S.

*Id.* at 175, 838 A.2d 404 (emphasis added). We affirmed the contract damages "as a determination by the jury, after the fact, of what level of business would have resulted from reasonably diligent efforts." *Id.*

## 2.

### Access That "Can Be Reasonably Provided"

██ We recognize that this case involves a promise to create a side street access route across each venturer's prop-

erty "if [such] access can be reasonably provided," rather than a promise to use "best efforts" to refer business. We nevertheless find the principles governing interpretation of open term contracts equally applicable to both business agreements.

In *First Union*, we examined the meaning of "best efforts" in various business contract contexts in order to decide whether that term has a sufficiently definite meaning to be enforceable. A similar approach is appropriate here.

> "[W]here trade custom or usage attaches a special meaning to certain words or terms used in any particular trade or business, it is competent for the parties to a contract in which such words and terms are used to show the peculiar meaning of them in the business or trade to which the contract relates, not for the purpose of altering, adding to, or contradicting the contract, but for the purpose of elucidating the language used as a means of enabling the court to interpret the contract language according to the intention of the parties. This rule applies unless there is something to indicate that the parties did not use the language as it is used in the particular trade or business."

*Della Ratta, Inc. v. Am. Better Community Developers, Inc.,* 38 Md.App. 119, 130, 380 A.2d 627 (1977) (citation omitted). Given the parties' stated intent to offer each other an alternative side street access route if it "can be reasonably provided," we consider whether such a promise may have had a mutually understood meaning in this property contract.

In property law, the concept of "reasonable access" is a standard that is commonly used in defining rights to ingress and egress. For example, in a recent easement of necessity case, this Court and the Court of Appeals applied the established rule that "an equitable disposition requires the circuit court to determine a location that will be fair to both parties and will inconvenience the owner of the servient parcel 'only so much as is necessary to provide' the owner of the dominant parcel ***reasonable access*** to his land." *Stansbury v. MDR Dev., L.L.C.,* 161 Md.App. 594, 618–19, 871 A.2d 612 (2005), *aff'd,* 390 Md. 476, 889 A.2d 403 (2006) (emphasis added). *See*

*also Beck v. Mangels,* 100 Md.App. 144, 156, 640 A.2d 236 (1994) (affirming court order that "reasonable access" associated with easement of necessity means " 'that access required for the dominant estate to make full utilization of its land' ").

In addition, this Court has affirmed injunctive relief that ensured a commercial tenant "reasonable access" to its property, holding that the trial court has authority to evaluate and define such access in terms of the intended and actual use for that property. In *B & P Enter. v. Overland Equipment Co.,* 133 Md.App. 583, 641, 758 A.2d 1026 (2000), we required a commercial landlord to provide "reasonable access" so that a business tenant could reach its vehicle storage lot after the landlord relocated it. Even though the lease permitted the relocation and did not mention "reasonable access," we held that the right to such access was implicit in the lease agreement. *See id.* The landlord therefore had a duty to ensure that the tenant's wreckers and tow trucks would "have no difficulty in entering or exiting" the lot when "towing a vehicle," and to perform additional grading work in order to ensure such access. *See id.*

Indeed, the Court of Appeals recognized 150 years ago that "reasonable access" to a commercial property may require side street access. In *Roman v. Strauss,* 10 Md. 89, 1856 WL 3831, *6 (1856), the Court declined to dismiss the complaint of a business owner who claimed that traffic conditions on the thoroughfare adjacent to his business made it reasonably necessary to preserve an alternative route to his business via an alley.

If, as we must assume, the streets binding on this property are already rendered nearly impassable by the rail road tracks laid upon them, leaving the alley as the only reasonably convenient mode of reaching the property and place of business of the complainants, and if, by the rail road track which the appellants are causing to be laid across the alley, and the uses thereof, the complainants will be prevented from enjoying their easement—that is, from using **the alley—which they aver to be their only reasonable and convenient outlet,** thereby nearly destroying the value of

their property, the objection taken to [the complainant's] bill cannot be sustained[.]

*Id.* (emphasis added).

Citing *Roman,* the Court of Appeals similarly observed in *Gore v. Brubaker,* 55 Md. 87, 1880 WL 5079, *2 (1880), that, if, by reason of the obstructions complained of, in the public way or alley, the plaintiff had been obstructed or deprived of **reasonable access** to his buildings on his lot, and thereby subjected to loss and inconvenience, that would be such special and particular injury to the plaintiff as would entitle him to remedy from a Court of equity. (Emphasis added.)

These cases illustrate that the concept of "reasonable access" is sufficiently established in the law that professional developers such as LDG and 8621 may understand and intend their future development plans to be governed by it. Moreover, although none of these cases specifically defines "reasonable access," collectively they demonstrate that the determination of what is commercially reasonable access will depend upon the particular need for the route in question.

Reviewing paragraph 10 of the Joint Venture Agreement, we conclude LDG's "provide access if reasonable" promise could create a mutually binding obligation to use good faith and reasonable diligence in attempting to establish a side-street access route for the benefit of each subdivided lot. In *First Union,* the agreed-upon objective was to regularly refer title search business. Here, there is an equally clear objective—to create side street access routes. A fact-finder could conclude that the use of such a plainly stated objective, coupled with an "open term" performance standard, means that LDG and 8621 agreed to act in good faith and to exercise reasonable diligence in order to determine whether the mutually desirable access routes could be built into their development plans.

Applying the principles discussed above, we hold that the motion court erred in concluding that the promise to create a side street access route if that "can reasonably be" done is "merely aspirational." A reasonable fact-finder could con-

clude that, like the "best efforts" referral standard in the *First Union* contract, this standard memorializes "a meeting of the minds" obligating each joint venturer to act in good faith and to be reasonably diligent in attempting to afford the other access to the named side streets. The materiality of such a mutual commitment is obvious, since additional ingress and egress routes could substantially affect the development potential of both subdivided lots.

Given the myriad uncertainties surrounding any development project that has yet to "hit the drawing board," what efforts each party would be obligated to make to provide a reasonable access route is a matter that the parties may have deemed appropriate for *post hoc* consideration. Like First Union and 3S in contemplation of their future business relationship, LDG and 8621 did not specify exactly what efforts or what access would satisfy their agreement about side street access. Moreover, like First Union, LDG "had some discretion" in determining whether it could provide access within its development plans. It is reasonable to infer from the language in paragraph 10, however, that the parties agreed that any evaluation of whether they acted in good faith and with diligence would be made "after the fact," by a fact-finder considering the course of dealing between them.

To be sure, the contract language leaves room for debate as development plans progress, about whether the desired side street access could "be reasonably provided." Nevertheless, a reasonable person could read the access clause as a mutually binding promise to determine in good faith whether the desired access could be provided, which requires each party to make commercially reasonable efforts to create an access route from the designated side streets to the other party's subdivided lot. Such an interpretation is consistent with the objective stated in the contract—to maximize the development potential and value of each subdivided lot. And it avoids making the bargained-for access "merely aspirational." We therefore agree with 8621 that the circuit court erred in ruling as a matter of law that the access clause is an unenforceable agreement to agree.

## B.

### Cohen's Affidavit

 LDG posits that 8621 cannot consistently take the position that the access clause is unambiguous, while simultaneously relying on Cohen's affidavit as extrinsic evidence to establish the enforceability of that clause. We disagree.

As a threshold matter, we observe that LDG incorrectly assumes that uncertainty necessarily results in unenforceability and ambiguity. *See B & P Enters.*, 133 Md.App. at 605, 758 A.2d 1026 (contract language is considered ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning"). As we explained above, uncertainty as to whether access reasonably can be provided at some point in the future, by itself, does not make the contract unenforceable. *See generally* Gergen, *supra*, 92 Colum. L.Rev. at 1007 ("open terms are used when uncertainty makes it costly to negotiate fixed-performance terms"). Similarly, such uncertainty, by itself, does not make the access clause ambiguous. We explain.

 In most cases, extrinsic evidence is admissible only to explain an ambiguous contract term. *See Beale v. Am. Nat'l Lawyers Ins. Reciprocal*, 379 Md. 643, 658, 843 A.2d 78 (2004). In certain circumstances, however, extrinsic evidence is admissible under the terms of the contract itself, rather than merely to explain those terms. This is such a case.

When parties use an open contract term such as "reasonable efforts" to govern their future business relationship, they necessarily agree that any evaluation of their respective performances under that standard will take into account all relevant evidence regarding the course of that business relationship. In this case, the agreement to provide access "if it can be reasonably provided" requires the fact finder to examine the parties' entire course of dealing in order to determine why LDG failed to provide access. Thus, Cohen's affidavit is admissible for the purpose of raising a material factual dispute

as to whether LDG breached the access clause of the Joint Venture Agreement. *See* Md. Rule 2–501(b).

## C.

### Summary Judgment

Reviewing the summary judgment record, we find sufficient evidence from which a fact-finder could conclude that LDG, "under the circumstances, did not act in good faith in exercising diligence." *See First Union*, 154 Md.App. at 172–73, 838 A.2d 404. To be sure, LDG had discretion in determining how to develop its portion of the Wolfe Property. According to Cohen and LDG's own witnesses and pleadings, however, LDG refused to provide any access, without making any effort to consider whether a side-street route could be reasonably provided. In fact, it appears that LDG repudiated the access clause before it ever began its site planning. We agree with 8621 that a jury could conclude that LDG breached the access clause by repudiating its obligation to 8621 without having made any effort to determine whether such access could be reasonably provided.

## II.

### 8621's Appeal: Material Breach And Impossibility

As alternative grounds for summary judgment, the circuit court held that the sale of the Chambers Parcel either constituted a material breach of the Joint Venture Agreement, or made enforcement of the reasonable access clause impossible, with either outcome excusing LDG from its obligation to provide 8621 access to Cameron Street. 8621 challenges these conclusions, arguing that "the post-suit sale of the Chambers Parcel does not excuse LDG's earlier non-performance under Paragraph 10." We agree.

## A.

### Material Breach

LDG's repudiation of the access clause may have constituted waiver of its contractual right to such access, or

anticipatory breach.[4] Ultimately, that is for the jury to decide, after resolving the various factual disputes, drawing inferences, and weighing the evidence. What is clear at this juncture, however, is that, as a result of LDG's disclaimer of the access clause, 8621 may have been excused from undertaking efforts to provide LDG access across the Chambers Parcel. *See Washington Homes, Inc. v. Interstate Land Dev. Co., Inc.*, 281 Md. 712, 728, 382 A.2d 555 (1978).

Although LDG is correct that it is entitled to "get the *quid* (access across the Chambers Parcel to Cameron Street) for its *quo* (access across the LDG Parcel to Fenton Street)," it incorrectly assumes that the remedy for the post-lawsuit sale of the Chambers Parcel is absolution from its prior breach. For purposes of this analysis, we shall assume that 8621 had a duty to permit LDG access across 8621's portion of the Wolfe Property, and also to exercise its equity in and influence over the partnership that owned the Chambers Parcel to allow LDG access across that property to Cameron Street.[5] The sale of the Chambers Parcel unquestionably prevented 8621 from providing such access.

The record shows, however, that the Chambers Parcel was not sold until nearly a year after LDG filed suit to declare the access provision unenforceable, and long after LDG renounced its interest in securing access through the Chambers Parcel to

---

**4.** "[W]hen 'in anticipation of the time of performance one definitely and specifically refuses to do something which he is obliged to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation, and the other party may, at his election, treat that contract as abandoned, and act accordingly.' "
*String v. Steven Dev. Corp.*, 269 Md. 569, 580, 307 A.2d 713.

**5.** Technically, 8621 could not have breached the access clause by selling the Chambers Parcel, because 8621 never owned, and therefore did not sell, that property. Nevertheless, we reject LDG's argument that the fact that the Chambers Parcel was not owned by 8621 "only . . . highlight[s] that, if 8621's construction of Paragraph 10 is correct, then it could not deliver what it promised even at the time it made the promise." As discussed, the contract required 8621 to make reasonable efforts to provide access, which a fact-finder could construe as requiring 8621 to use its equity and influence in the partnership that owned the Chambers Parcel to secure such access.

Cameron Street. If a jury finds that LDG breached the access clause by refusing to provide access through its property, then 8621's failure to preserve the possibility of LDG obtaining side street access across the Chambers Parcel may be excused. *See Funger v. Mayor of Somerset,* 249 Md. 311, 330, 239 A.2d 748 (1968) ("To one who is sued for nonperformance of his promise it is a defense if he can prove that his performance was prevented or substantially hindered by the plaintiff") (quoting Corbin, *supra,* §§ 770, 947). The motion court erred in holding, as a matter of law, that the sale of the Chambers Parcel constituted a material breach by 8621, and that LDG's performance under the Joint Venture Agreement was excused by that material breach.

## B.

### Impossibility

■ LDG posits that, "if 8621 LP is free to sell the Chambers Parcel, then LDG might likewise sell its property, rendering access to Fenton Street across the LDG Parcel likewise impossible." The circuit court agreed. We do not.

■ LDG's impossibility argument ignores that 8621 may have been excused from its obligation to provide LDG access across the Chambers Parcel as a result of LDG's repudiation of the access clause. "Repudiation of a contract by one party gives the other party a choice of remedies." *Washington Homes,* 281 Md. at 728, 382 A.2d 555.

A jury could conclude that, when LDG declared that it would not provide 8621 access across its properties, it repudiated the contract. In that case, 8621 had the option to (1) accept LDG's repudiation of the access clause and walk away, (2) sue for damages caused by LDG's breach, or (3) seek specific performance of LDG's contractual obligation. *See id.*

8621 pursued options (2) and (3), filing alternative claims for breach of contract and specific performance. With the sale of the Chambers Parcel, the prospect of mutually available side street access routes appears to have been extinguished. The lack of mutuality, however, does not necessarily preclude specific performance of the access clause against

LDG. *See, e.g., Baker v. Dawson,* 216 Md. 478, 487, 141 A.2d 157 (1958) ("Want of mutuality of remedy will not preclude specific performance unless the court finds that it is unable to insure the receipt by the defendant of that to which he was entitled under the contract"); *Restatement (Second) of Contracts* § 363 (1981 & Supp.2005) ("the fact that specific performance ... is not available to one party is not a sufficient reason for refusing it to the other party").

Of course, whether 8621 is entitled to any remedy, and if so, what remedy is appropriate, are matters to be resolved on remand. The decision to order specific performance is within the sound discretion of the trial court. *See Hupp v. Geo. R. Rembold Bldg. Co.,* 279 Md. 597, 600, 369 A.2d 1048 (1977). As a substitute for specific performance, a court may award benefit of the bargain damages. *See Beard v. S/E Jt. Venture,* 321 Md. 126, 144, 581 A.2d 1275 (1990). Typically, specific performance is granted when money damages are inadequate, such as when the plaintiff cannot secure a comparable substitute performance by means of money awarded as damages. *See Simmons v. Simmons,* 37 Md.App. 202, 206, 376 A.2d 1147 (1977); *Restatement (Second) of Contracts* § 360. If 8621 established that it is entitled to an access route across LDG's property, but 8621 cannot provide reciprocal access across the Chambers Parcel, then LDG would be entitled to have any benefit or savings that 8621 may obtain by not providing such access considered. In that event, for example, 8621 might be awarded an access route, but required to account for the value of the reciprocal access route that 8621 was excused from providing to LDG. *Cf. Baker,* 216 Md. at 478, 141 A.2d 157 (mutuality of remedy unnecessary if court can ensure defendant receives the value of what he contracted for).

### III.

### LDG's Cross–Appeal: Jurisdiction Over The Breach Of Fiduciary Duty Claim

LDG complains that the circuit court erred in denying its motion to dismiss the breach of fiduciary duty claim, on the

ground that it lacked jurisdiction to rule while this appeal is pending. It argues that the court retained jurisdiction over Count IV because "[n]oting an appeal does not deprive the trial court of fundamental jurisdiction" with respect to decisions and order that are not under appellate review. *See Pulley v. State*, 287 Md. 406, 416–17, 412 A.2d 1244 (1980). Alternatively, LDG argues that the court should have dismissed this count because "Maryland does not recognize a cause of action for breach of fiduciary duty." *See Int'l Bro. of Teamsters v. Willis Corroon Corp. of Md.*, 369 Md. 724, 728 n. 1, 802 A.2d 1050 (2002); *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509 (1997); *Vinogradova v. Suntrust Bank, Inc.*, 162 Md.App. 495, 509–10, 875 A.2d 222 (2005).

 We do not review the denial of a motion to dismiss on substantive grounds that the motion court did not consider. *See, e.g., Davis v. DiPino*, 337 Md. 642, 656, 655 A.2d 401 (1995) ("the plaintiff is prejudiced when an appellate court *sua sponte* raises and grants a motion to dismiss for failure to state a claim upon which relief can be granted"). As for the circuit court's jurisdiction over the remaining claim, we agree that, "while an appeal from an interlocutory injunction is being pursued, the trial court may proceed with any other issue or matter in the case." *Mangum v. Md. State Bd. of Censors*, 273 Md. 176, 179–80, 328 A.2d 283 (1974). Regardless of whether the court failed to do so because it believed that it lacked jurisdiction, or because it exercised its discretion not to proceed, the matter is rendered moot by our decision.

## IV.

### LDG's Cross–Appeal: Stay Without Bond

 LDG also complains that the circuit court erred in staying proceedings on the breach of fiduciary duty claim pending this appeal, without requiring 8621 to post an appeal bond. *See Pulley v. State*, 287 Md. 406, 417, 412 A.2d 1244 (1980). Under Md. Rules 2–632 and 8–422(a)(1),[6] the court had discretion to determine whether a supersedeas bond was

---

6. Md. Rule 2–632 provides:

necessary. *See O'Donnell v. McGann,* 310 Md. 342, 345, 529 A.2d 372 (1987) (courts have inherent power to fix terms and conditions for stay of execution of judgments, including discretion to modify posting requirements for supersedeas bond). We find no abuse of that discretion here, particularly in light of the fact that the property remained under joint ownership.

**DECLARATORY AND INJUNCTIVE ORDER VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

(a) Stay of Interlocutory Order. On motion of a party the court may stay the operation or enforcement of an interlocutory order **on whatever conditions the court considers proper for the security of the adverse party.** The motion shall be accompanied by the moving party's written statement of intention to seek review of the order on appeal from the judgment entered in the action. . . .

(e) Pending Appeal. Except as provided in this section and in section (f) of this Rule, a stay pending appeal is governed by Rules 8–422 through 8–424. . . . (Emphasis added.)

Md. Rule 8–422(a)(1) provides:

Stay of an order granting an injunction is governed by Rules 2–632 and 8–425. Except as otherwise provided in the Code or Rule 2–632, an appellant may stay the enforcement of any other civil judgment from which an appeal is taken by filing with the clerk of the lower court a supersedeas bond under Rule 8–423. . . . . The bond or other security may be filed at any time before satisfaction of the judgment, but enforcement shall be stayed only from the time the security is filed.