REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1371

September Term, 2014

_____

ADVANCE TELECOM PROCESS LLC

v.

DSFEDERAL, INC.

_____

Krauser, C.J.,
Graeff,
Kehoe,

JJ.

_____

Opinion by Graeff, J.

_____

Filed: July 30, 2015

Advance Telecom Process, LLC ("Advance"), appellant, appeals from the order of the Circuit Court for Montgomery County granting the motion filed by DSFederal, Inc. ("DSFederal"), appellee, to dismiss Advance's complaint for failure to state a claim upon which relief could be granted. Advance raises three questions for our review, which we have rephrased slightly, as follows:

1. Did the circuit court apply the proper standard in granting DSFederal's motion to dismiss?

2. Did the circuit court correctly determine that the Teaming Agreement was not an enforceable contract, and therefore, that Count I of the complaint failed to state a cause of action for breach of contract?

3. Should this Court allow Advance leave to amend its circuit court complaint?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 3, 2014, Advance filed an eight-count complaint against DSFederal, alleging that DSFederal unlawfully terminated a Teaming Agreement between the parties and committed a variety of other torts.[1] Because this appeal involves the propriety of the circuit court's ruling granting a motion to dismiss for failure to state a claim upon which relief could be granted, the relevant facts are those alleged in the complaint, set forth as follows.

---

[1] In the circuit court, Advance did not oppose DSFederal's motion to dismiss Counts II, III, IV, VI, VII, and VIII, but instead, it defended the legal sufficiency of only Count I (breach of contract) and Count V (unjust enrichment). On appeal, Advance challenges only the dismissal of Count I, breach of contract. Accordingly, that is the only count we will address.

Advance is a Virginia limited liability company and a certified Small Disadvantaged Business 8(a) Contractor, as defined by the U.S. Small Business Administration ("SBA").[2] DSFederal is a Maryland corporation and a woman-owned SBA 8(a) Contractor. DSFederal also is certified by the U.S. General Services Administration as an 8(a) STARS Contractor.[3]

The Complaint alleged that, over a twelve-month period, Advance created and developed two projects: (1) Enterprise Applications Security, Identity Management & Access Management, and (2) Rapid Development of "Proof Concept" Application. Advance then submitted a White Paper to U.S. Citizenship & Immigration Services, U.S. Department of Homeland Security ("USCIS-DHS"), proposing the projects. The White Paper was formatted in a way that "it could be submitted to other federal agencies for implementation into their systems once it had been fully approved, implemented and deemed a success by USCIS-DHS, thereby increasing its value as a selling point of" Advance.

---

[2] A disadvantaged business is generally one that is 51% or more owned and controlled by one or more persons who are socially and economically disadvantaged. *Disadvantaged Businesses*, www.SBA.gov, http://perma.cc/TP6Q-MM6M (last visited June 1, 2015). In order to help small, disadvantaged businesses compete in the marketplace, the U.S. Small Business Association created the 8(a) Business Development Program. The 8(a) Business Development Program is a business assistance program for small disadvantaged businesses. *8(a) Business Development Program*, www.SBA.gov, http://perma.cc/4N97-WLHC (last visited May 5, 2015).

[3] 8(a) STARS is a small business set-aside Government Wide Acquisition Contract ("GWAC") that provides flexible access to customized internet technology solutions from a large, diverse pool of 8(a) industry partners. *8(a) STARS II GWAC*, www.GSA.gov, http://perma.cc/4VU2-GF8F (last visited May 5, 2015).

After Advance presented the White Paper, USCIS-DHS notified Advance that it would accept the proposal under a sole-source contract, based upon Federal Acquisition Regulations ("FAR") 6.3. USCIS-DHS also informed Advance that the sole-source contract would be subject to the 8(a) STARS II GWAC program. Advance then began researching the available certified 8(a) STARS contractors, and it was referred to DSFederal.

Advance contacted DSFederal and disclosed "all the relevant facts and details involving" the proposal. DSFederal then entered into a contractual relationship with Advance. The Complaint characterized this relationship as including "the parties' execution of any and all Teaming Agreement(s), subcontract(s), and/or any and all required necessary documentation for the purpose of obtaining and working on the sole-source contract of the proposed project that [Advance] had submitted to USCIS-DHS." DSFederal agreed and contracted with Advance to "jointly develop and submit a bid to USCIS-DHS for said project." Based on the contractual relationship between the parties, Advance submitted DSFederal's name to USCIS-DHS as the 8(a) STARS contractor for the project.

Thereafter, Advance and DSFederal "actively pursued, developed and created a proposal and bid to submit to USCIS-DHS," which offer and proposal included "the relationship between" Advance and DSFederal. Advance and DSFederal also entered into a Teaming Agreement, which the complaint alleged incorporated the scope of work to be performed by each party. According to the complaint, the Teaming Agreement provided that, within ten days of receipt of the contract from USCIS-DHS, DSFederal was to provide

3

a copy of the contract to Advance, DSFederal was required to issue a subcontract to Advance "for consulting support to meet the overall solicitation requirement of the USCIS-DHS contract," and DSFederal was to "use its best efforts to award [Advance] a target work share of fifty-eight (58%) percent of effort based on labor costs awarded under the contract or the valuable consideration of the Teaming Agreement and expected and required Subcontract." Advance was required to provide DSFederal with "proprietary information and industry expertise."

Advance and DSFederal worked together to complete all applicable requirements of the pre-bid solicitation. Sometime after submitting the bid, DSFederal was awarded a sole-source GWAC by the USCIS-DHS to develop and implement the two projects based on the "combined efforts of the parties." Thereafter, the Complaint alleges, DSFederal "constructively terminated" Advance, despite a clause in the Teaming Agreement requiring mutual termination.

Count I of the Complaint, alleging breach of contract, stated that DSFederal had a contractual obligation to execute a subcontract with Advance "that it knows, and knew, is, and was always, required by USCIS-DHS, in order for [Advance] to work, and continue to work, to complete this project, but has failed to do so." DSFederal also failed to present Advance with a copy of the contract with USCIS-DHS, failed to allow Advance's staff to begin work, and illegally terminated the Teaming Agreement. Advance sought damages in the amount of $2,200,000.

DSFederal filed a motion to dismiss the complaint. It attached as Exhibit 1 the Teaming Agreement, which Advance did not attach to the complaint. The Teaming

4

Agreement was executed on September 11, 2013, by DSFederal, "Team Leader," and Advance, "Team Member."

The Teaming Agreement stated that the parties had "concluded that it is to their mutual benefit to act as a team for the purpose of preparing and submitting a proposal in response to" the Request for Proposal ("RFP") that the USCIS-DHS would be issuing for Identity, Credential, and Access Management ("ICAM"). It provided that, if USCIS-DHS awarded DSFederal a contract, DSFederal "intends to negotiate a subcontracting agreement with" Advance, and Advance "intends to perform work as set forth in" the statement of work ("SOW") attached.

With respect to the specific obligations of the parties, section 1(e) of the Teaming Agreement provided for duties regarding submission of the proposal, and it stated that, "[i]n the event that the contract awarded by [USCIS-DHS] as a result of proposals submitted in response to the RFP ("the Prime Contract") is awarded to [DSFederal], the parties will negotiate in good faith and execute a subcontract agreement . . . subject to applicable laws and regulations, and, if required by the Prime Contract, the consent/approval of [USCIS-DHS]."

Section 1(b) provided that DSFederal "shall, with the assistance of [Advance], prepare the Proposal and submit the Proposal to [USCIS-DHS] identifying [Advance] as a subcontractor providing the services identified in Attachment A." Attachment A identified two categories of work to be performed by the parties under the headings "Proposal Development" and "Contract Performance Work Distribution." The work under the "Contract Performance Work Distribution" category was listed as follows:

1. Within 10 calendar days of award, [DSFederal] will issue a Subcontract to [Advance] for consulting support to meet the overall solicitation requirements.
2. [Advance] will designate a corporate executive who will attend periodic team meetings, provide status to DSFederal, and ensure that [Advance] project staff collaborate with the DSFederal Project Manager, DSFederal management, and staff as necessary to identify and mitigate risks, timely resolve issues, prepare and review deliverables specifically called out herein or in the SOW.
3. As required by the Government, [Advance] shall track and report progress and costs in a format to be specified by DSFederal.
4. [Advance] staff will fully cooperate with DSFederal's efforts to manage the DSFederal project team as an integrated whole, focused on the delivery of high-quality, compliant services to the Government, without respect to employment affiliation.
5. DSFederal will use best efforts to award [Advance] a target work share of 58% of the effort based on labor costs awarded under the contract.
6. Work Share level of work is contingent upon:
   - [Advance] filling offered positions in a timely manner.
   - [Advance] performing at such a level that it does not adversely impact on [DSFederal's] past performance ratings.
   - [DSFederal's] performing the minimum level of work required by law or regulation.

In its motion to dismiss, DSFederal argued that the Complaint failed to state a cause of action for breach of contract, and therefore, it should be dismissed with prejudice. In support, it argued that the "Teaming Agreement is nothing more than an agreement to negotiate open issues in good faith to reach a contractual objective within an agreed framework," i.e., it was an agreement to agree, rather than a valid and enforceable contract.

In its opposition, Advance acknowledged the cases holding that teaming agreements were unenforceable contracts. It argued, however, that the Teaming Agreement here was distinguishable because it is clear that the parties intended to negotiate a subcontract, and

6

the essential terms of the Agreement "have been determined or have set in place an objective framework with which to ascertain that essential term."

In reply, DSFederal again asserted that the Teaming Agreement here was merely an unenforceable agreement to agree. In support, it stated that the Agreement provided that the parties would negotiate a subcontract at some point in the future, and it "failed to identify essential terms such as exactly what services [Advance] would provide, how [Advance] would provide them, when [Advance] would provide them, and what [Advance] would be paid for them."

On August 19, 2014, the court held a hearing on the motion.[4] At the conclusion of the hearing, the court granted the motion to dismiss, agreeing with DSFederal that the Teaming Agreement was "an agreement to agree," and therefore, it was not an enforceable contract. This appeal followed.

## STANDARD OF REVIEW

"A trial court may grant a motion to dismiss if, when assuming the truth of all well-pled facts and allegations in the complaint and any inferences that may be drawn, and viewing those facts in the light most favorable to the non-moving party, 'the allegations do not state a cause of action for which relief may be granted.'" *Latty v. St. Joseph's Soc'y of the Sacred Heart, Inc.*, 198 Md. App. 254, 262-63 (2011) (quoting *RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 643 (2010)). The facts set forth in the complaint must be

---

[4] The court inquired regarding the Agreement's requirement that DSFederal "negotiate in good faith." Counsel for DSFederal stated, without contradiction, that there was no claim that DSFederal did not negotiate in good faith, but rather, Advance was alleging that DSFederal failed to complete an agreement with it.

7

"pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *RRC*, 413 Md. at 644.

"'We review the grant of a motion to dismiss de novo.'" *Unger v. Berger*, 214 Md. App. 426, 432 (2013) (quoting *Reichs Ford Road Joint Venture v. State Roads Comm'n*, 388 Md. 500, 509 (2005)). *Accord Kumar v. Dhanda*, 198 Md. App. 337, 342 (2011) ("We review the court's decision to grant the motion to dismiss for legal correctness."), *aff'd*, 426 Md. 185 (2012). We will affirm the circuit court's judgment "'on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised.'" *Monarc Constr., Inc. v. Aris Corp.*, 188 Md. App. 377, 385 (2009) (quoting *Pope v. Bd. of Sch. Comm'rs*, 106 Md. App. 578, 591 (1995)).

## DISCUSSION

### I.

### Status of Motion

Advance's first argument is that the circuit court erred by "treating the Motion to Dismiss hearing as a Motion for Summary Judgment" and granting the motion "prior to determining whether material facts existed that were not discernible from the [c]omplaint." It asserts that "there are genuine disputes of material facts" that "cannot be resolved merely by looking to the [c]omplaint" but must wait until the "parties have had their opportunity to complete discovery."

DSFederal contends that the court correctly decided its motion to dismiss by considering only those facts alleged in Advance's complaint and the "Teaming Agreement referenced and relied on in the complaint." It asserts that consideration of the Teaming

8

Agreement did not require the court to treat the motion to dismiss as a motion for summary judgment because Advance's breach of contract claim was based on this document. It disputes Advance's argument that the court should have allowed discovery to be completed before considering DSFederal's motion to dismiss, noting that Advance conceded before the circuit court that the "sufficiency of its claim for breach of contract was properly judged based on the allegations of the [c]omplaint and the text of the Teaming Agreement." Moreover, it asserts that discovery cannot be used at the motion to dismiss stage to "provide the multiple and reasonable inferences that its pleading allegations lack."

We begin with Advance's suggestion that the court's consideration of the Teaming Agreement converted the motion to dismiss into a motion for summary judgment. We agree, as a general proposition, that where matters outside of the allegations in the complaint and any exhibits incorporated in it are considered by the trial court, a motion to dismiss generally will be treated as one for summary judgment. *See, e.g., Worsham v. Ehrlich*, 181 Md. App. 711, 722 (The trial court has "discretion to convert a motion to dismiss to a motion for summary judgment by considering matters outside the pleading."), *cert. denied*, 406 Md. 747 (2008). Where, however, a document such as the Teaming Agreement merely supplements the allegations of the complaint, and the document is not controverted, consideration of the document does not convert the motion into one for summary judgment. *See Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 788, n.4 (2015) (although the plaintiff did not attach a Deposit Account Agreement to his complaint, "he expressly referred to it and repeatedly alleged that its disclosures that did not satisfy the" Consumer Protection Act; thus, the court properly regarded the agreement as "simply

supplementing the allegations in the complaint."); *Smith v. Danielczyk*, 400 Md. 98, 105 (2007) (because there was no dispute regarding the extraneous material appended to defendant's motion to dismiss, and plaintiff did not controvert the defendant's factual averments, appellate court treated the extraneous materials "as simply supplementing the allegations in the complaint"). Accordingly, the circuit court's consideration of the Teaming Agreement did not convert the motion to dismiss into a motion for summary judgment.

Indeed, the record reflects that the parties and the circuit court proceeded on the understanding that the hearing was addressing a motion to dismiss. Counsel for Advance agreed that the "standard at this stage – and we're at the motion to dismiss stage – is basically . . . whether the complaint, on its face, discloses a legal and sufficient cause of action." The contention that the court "erred by treating the motion to dismiss hearing as a motion for summary judgment" is not supported by the record. We thus turn to the propriety of the court's ruling granting the motion to dismiss.

## II.

### Teaming Agreement

On the merits, Advance contends that the circuit court erred in granting DSFederal's motion to dismiss its complaint for failure to state a claim for breach of contract. In support, it asserts that the court erred in finding "that the Teaming Agreement is an agreement to agree and not a contract."

Advance concedes that "relevant Maryland law, and other jurisdictions, generally speaks to the unenforceability of teaming agreements, where future negotiations between

10

the parties are contemplated." It argues, however, that in this case, where the terms of the Teaming Agreement are "either explicitly stated and/or provide a framework for interpreting the terms," the agreement shows mutual assent to be bound, and therefore, the Teaming Agreement is an enforceable contract.

DSFederal responds in two ways. Initially, it urges this Court not to consider the merits of Advance's challenge to the trial court's "ruling that the Teaming Agreement was an unenforceable agreement to agree," asserting that Advance offers no explanation of precisely how the trial court erred, and it does not identify the "supposed" explicitly stated terms "or the interpretative framework that it claims exists." In any event, it contends that Advance's argument fails on the merits because "it is clear under applicable Maryland precedent that the Teaming Agreement lacked the certainty and definiteness of terms necessary for it to be an enforceable contract."

We address first DSFederal's argument that we should not consider the merits of the appeal. Although we agree that the brief could have been more detailed, *see Diallo v. State*, 413 Md. 678, 692-93 (2010) ("'arguments not presented in a brief or not presented with particularity will not be considered on appeal'") (quoting *Klauenberg v. State*, 355 Md. 528, 552 (1999), the argument in the brief, as fleshed out in oral argument, was sufficiently presented for us to address the merits of the claim.

We ultimately conclude, however, that Advance's argument is without merit. It is clear in Maryland that "an essential prerequisite to the creation or formation of a contract" is "a manifestation of mutual assent." *Cochran v. Norkunas*, 398 Md. 1, 14 (2007). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2)

11

definiteness of terms." *Id.* The "'[f]ailure of parties to agree on an essential term of a contract may indicate that the mutual assent required to make a contract is lacking." *Id.* Likewise, "[i]f parties do not intend to be bound until a final agreement is executed, there is no contract." *Id.*

Addressing first the intent requirement, this Court has stated that "'[t]he primary source for determining the intention of the parties is the language of the contract itself.'" *8621 Ltd. P'ship v. LDG, Inc.*, 169 Md. App. 214, 226 (quoting *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 291 (1996)), *cert. denied*, 394 Md. 480 (2006). Contracts are interpreted objectively, and "[i]f the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran*, 398 Md. at 16. "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law," which we review *de novo*. *Sy-lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163 (2003).

In *Cochran*, 298 Md. at 18, the Court of Appeals addressed whether a letter of intent to purchase property was an enforceable contract. The Court looked to the language of the agreement to ascertain the intent of the parties, and it held that, because the language of the document clearly indicated that the parties intended to formalize their agreement through a standard Maryland Realtor's contract, the letter of intent constituted a "preliminary 'agreement to agree,'" which the Maryland appellate courts generally have held to be unenforceable. *Id.* at 18-21. *See Horsey v. Horsey*, 329 Md. 392, 420-21 (1993) (an agreement to negotiate a future agreement, an agreement to agree, is not enforceable); *First*

12

*Nat'l Bank of Md. v. Burton, Parsons & Co., Inc.*, 57 Md. App. 437, 449 ("'Where an essential element of a contract is reserved for future agreement, no legal obligation as to such element arises until such future agreement is made.'") (quoting *Richmond Screw Anchor Co., Inc. v. Umbach*, 173 F.2d 532, 534 (7th Cir. 1949)), *cert denied*, 300 Md. 88, *cert. denied*, 300 Md. 90 (1984).[5]

Applying these principles, we address whether the Teaming Agreement here is enforceable. Although the Maryland appellate courts have not addressed whether, or under what circumstances, teaming agreements are enforceable, courts in other jurisdictions have done so. We find the analysis in these cases instructive.

In *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666-67 (3d Cir. 1998), the United States Court of Appeals for the Third Circuit discussed teaming agreements as follows:

> Typically, a teaming agreement is an arrangement whereby a subcontractor will "team" with a company intending to bid on a government contract as a prime contractor in order to pool financial and technical resources. . . . The subcontractor would ordinarily provide technical expertise and assist in the prime contractor's bid submission in return for the prime contractor's promise to award the subcontract. Parties to such a teaming agreement benefit from the arrangement not only as a means of sharing resources, but also as a hedge against the many uncertainties involved in government contracting. In many cases, the finalized subcontract between the parties to a teaming agreement will specifically enumerate the scope of obligations for each party contingent upon the prime contractor winning the RFP so that there is usually little need to enforce the teaming arrangement itself. Often, however, the parties may reach an understanding to team, but fail to execute

---

[5] In *Cochran v. Norkunas*, 398 Md. 1, 13 n.5 (2007), the Court of Appeals noted that a preliminary agreement to negotiate in good faith regarding open terms is an enforceable agreement. If negotiations fail, however, "no final contract exists because this type of preliminary agreement does not commit the parties to their ultimate contractual objective." *Id.*

a subcontract as anticipated in the teaming agreement. . . . As with most other "preliminary agreements" precedent to an executed contract, *see generally* E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations,* 87 Colum. L.Rev. 217 (1987), the question arises whether the teaming agreement itself, absent an executed subcontract, may constitute the basis for contractual liability.

***

The fact that the parties never finalized an implementing subcontract is usually not fatal to enforcing the teaming agreement on its own—if the parties intended the teaming agreement itself to constitute a binding agreement that enumerated definite terms of behavior governing the parties during, or even after, the bidding process.

In *ATACS*, the court held that, where a teaming agreement provides for obligations that are definite and mutually agreed upon, such as an agreement to negotiate in good faith or an agreement to negotiate exclusively, the obligations can be enforced. *Id.* at 667-68. A simple "promise to enter into a subcontract at a later date," however, does not constitute an enforceable contract. *Id.* at 667.

In *Cyberlock Consulting, Inc., v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 579 (2013), *aff'd*, 549 Fed. Appx. 211 (4th Cir. 2014), the United States District Court for the Eastern District of Virginia addressed the enforceability of a teaming agreement entered into for the purpose of obtaining a contract award from the federal government. Cyberlock argued, similar to the argument made by Advance here, that the teaming agreement obligated the prime contractor to provide it with a percentage of the contract, and the prime contractor breached the teaming agreement by failing to do so.

The court noted that, in Virginia, "[m]ere 'agreements to agree in the future' are 'too vague and too indefinite to be enforced,'" as are "'agreements to negotiate at some

14

point in the future.'" *Id.* at 578 (quoting *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997) and *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490 (E.D. Va. 2002)). It stated that "an agreement 'to negotiate open issues in good faith' to reach a 'contractual objective within [an] agreed framework will be construed as an agreement to agree rather than a valid contract.'" *Id.* (citation omitted).

In assessing whether there was "mutual assent . . . to terms reasonably certain," a requirement for the contract to be enforceable, the court looked to the language of the teaming agreement. It agreed with Cyberlock that there was some language in the agreement suggesting that Information Experts ("IE") was obligated to give 49% of the prime contract to Cyberlock. *Id.* at 581. In that regard, the Court noted that, in the "Responsibilities and Performance" section the agreement provided that if IE was awarded a prime contract, IE agreed to execute a subcontracting agreement to provide Cyberlock 49% of the prime contract, in accordance with the work as set forth in the attached exhibit. Additionally, the "Purpose of Teaming Agreement" section stated that, upon the Contract Award, IE "will perform 51% of the scope of work with [Cyberlock] performing 49%." *Id.* at 581.

The court held, however, that "the agreement read as a whole indicates that this particular language was not meant to provide a binding obligation but rather to set forth a contractual objective and agreed framework for the 'negotiat[ion] [of] a subcontract in the future along certain established terms.'" *Id.* at 581 (quoting *Beazer Homes Corp.*, 235 F.Supp.2d at 491-92). It pointed to several provisions in the agreement demonstrating that "(1) the parties contemplated that a future, formal subcontract would have to be negotiated

and potentially executed and (2) that they 'contemplated the possibility that the future transaction . . . might not ever come to fruition.'" *Id.* (citation omitted). The agreement stated that the parties had the responsibility to "exert reasonable efforts . . . to negotiate a subcontract," that the agreement would terminate if, despite good faith negotiations, the parties failed to reach agreement on a subcontract, that the agreement described the subcontract as "contemplated" and described Cyberlock's work share as "work anticipated to be performed," and the subcontract contemplated "was subject to the approval of the client." *Id.*

> The court ultimately concluded as follows:
>
> The most reasonable reading of [the] Second Teaming Agreement, construed as a whole, is that any seemingly mandatory language to award Cyberlock with a portion of the prime contract was modified by the provisions indicating that: (1) the award of such work would require the negotiation and execution of a future subcontract; (2) the award of such work was dependent on the success of such future negotiations; (3) any future executed subcontract was subject to the approval or disapproval of OPM FIS; and (4) suggesting that the framework set out for the work allocation in a future subcontract potentially could change as it merely was based on the work anticipated to be performed by Cyberlock as then-presently understood by the parties.

*Id.* at 581-82. The court held that the agreement was "an agreement to negotiate in good faith to enter a future subcontract, which was an unenforceable 'agreement to agree' on a subcontract." *Id.* at 582.

We find the analysis set forth in these cases to be persuasive. We hold that the terms of a Teaming Agreement, like any other contract, are enforceable only if the parties demonstrate mutual assent, i.e., the intent to be bound and definite terms. Here, the

16

Teaming Agreement contained some obligations that were enforceable. For example, under the SPECIFIC OBLIGATIONS OF THE PARTIES section, the agreement states:

> In the event that the contract awarded by the Client as a result of proposals submitted in response to the [Prime Contract] is awarded to [DSFederal], the parties will negotiate in good faith and execute a subcontract agreement ("the Subcontract"), subject to applicable laws and regulations, and, if required by the Prime Contract, the consent/approval of the Client.

Because this provision contained a definite and mutually agreed upon requirement to negotiate in good faith, this was an enforceable obligation. *See ATACS*, 155 F.3d at 667-68; *Cochran*, 398 Md. at 13 n.5. Advance does not argue, however, that DSFederal breached its duty to negotiate in good faith. Instead, it asserts that DSFederal breached the Teaming Agreement by failing to actually execute a subcontract.

We disagree with Advance and hold that the Teaming Agreement, when read as a whole, did not impose a contract obligation on DSFederal to execute a subcontract. Rather, it was an "agreement to agree" on a potential future subcontract, which is not an enforceable contract provision. We explain.

As in *Cyberlock*, there is some language in the Teaming Agreement suggesting an obligation by DSFederal to issue a subcontract to Advance. One of the WHEREAS clauses provides that, if DSFederal is awarded a contract, it "intends to negotiate a subcontracting agreement" with Advance, and Advance "intends to perform work as set forth in the [SOW] attached hereto and incorporated herein as Attachment A." Attachment A, in turn provides that, within 10 calendar days of award, DSFederal "will issue a Subcontract to [Advance] for consulting support to meet the overall solicitation requirements," and "will use best

17

efforts to award [Advance] a target work share of 58% of the effort based on labor costs awarded under the contract."

The remainder of the Teaming Agreement, however, read as a whole, indicates that the parties intended, not a binding obligation to issue a subcontract, but rather, as in *Cyberlock*, an agreed framework for negotiation of a future subcontract. As indicated, the contract provided that, if a contract was awarded to DSFederal, the parties would negotiate in good faith a subcontract agreement. This provision, as well as the provision stating that approval of the contemplated subcontract by the client may be required, makes clear that there was no binding agreement in place. Rather, it is clear from the terms of the Teaming Agreement that the parties envisioned that future negotiations were required before an enforceable subcontract would be executed.[6]

Because the Teaming Agreement left material terms for future negotiation, it constituted an agreement to agree on a future subcontract, and there was no enforceable requirement that DSFederal issue a subcontract to Advance. The circuit court properly found that the complaint failed to state a legal cause of action for breach of contract, and it properly granted the motion to dismiss.

## III.

### Leave to Amend

---

[6] Indeed, the Teaming Agreement did not set forth the material terms that the contemplated subcontract would contain, failing to specify what services Advance would actually perform, and what Advance would be paid. The inchoate nature of material terms of the contemplated subcontract show that there was no mutual assent regarding a contract.

18

Advance's final contention is that it should be allowed to file an amended complaint. It acknowledges that it did not seek leave to amend its complaint in the circuit court, pursuant to Md. Rule 2-341.[7] Nevertheless, it states that it "has not located or is unaware of any rule preventing it from requesting leave at this point in the proceedings. It requests, "[o]ut of the interest of justice" that this Court grant leave to file an amended complaint.

DSFederal contends that Advance's "request for leave to amend comes too late and should be denied." It asserts that this Court does not have the authority under Rule 2-341 to grant Advance leave to amend its complaint.

We agree. As we explained in *Bijou v. Young-Battle*, 185 Md. App. 268, 289 (2009), although Rule 2-341(b) is "silent as to when a request for leave to amend may be filed," a party may not amend the pleadings in the "appellate court after an appealable final judgment has been entered." Advance states no valid claim for relief in this regard.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[7] Rule 2-341(b) provides that a "party may file an amendment to a pleading [later than 30 days before the trial date] only with leave of court."

19