REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1751

September Term, 2014

_____

LARRY SUTTON

v.

FEDFIRST FINANCIAL CORPORATION,
ET AL.

_____

Graeff,
Reed,
Eyler, James R.
  (Retired, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed:  October 29, 2015

This appeal arises from a merger between FedFirst Financial Corporation ("FedFirst") and CB Financial Services, Inc. ("CB Financial"). After the merger agreement was announced, Larry Sutton, appellant, a former shareholder of FedFirst, filed a lawsuit against the two companies. He sought to enjoin the merger, alleging that: (1) FedFirst's directors breached fiduciary duties owed to FedFirst's shareholders; and (2) CB Financial aided and abetted the "breaches of fiduciary duty in connection with the Proposed Acquisition." On September 19, 2014, the circuit court dismissed Mr. Sutton's direct claims with prejudice.

On appeal, Mr. Sutton presents one multi-part question for our review,[1] which we have reorganized and reworded, as follows:

1. Did the circuit court err in granting the motion to dismiss the claims against the directors of FedFirst?

2. Did the circuit court err in granting the motion to dismiss the claims against CB Financial?

---

[1] Mr. Sutton's question presented is as follows:

Did the Circuit Court for Baltimore City err in dismissing the [Amended] Complaint with prejudice on grounds including that: (1) Appellant failed to assert a direct injury that is separate and distinct from that suffered by other stockholders; (2) *Shenker* does not permit individual stockholders to bring direct claims against corporate directors for breaches of the common law duties to maximize stockholder value and of candor in connection with non-cash-out merger transactions; (3) Appellant has not rebutted the presumption afforded [FedFirst's Directors] under Maryland's business judgment rule[]; (4) Appellant failed to meet his heavy burden of demonstrating in the Complaint that the information omitted from the S-4 [Registration Statement] was the sort of information stockholders needed to make an informed decision whether or not to vote in favor of the Transaction?

CB Financial and FedFirst present an additional question for our review, which we have reworded and rephrased slightly, as follows:

> Should this Court dismiss this appeal as moot because the merger between FedFirst and CB Financial, which has now been consummated, cannot be undone, leaving Mr. Sutton with no relief that the Court can order?

For the reasons set forth below, we conclude that the appeal is not moot, and we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Merger Agreement

On April 15, 2014, FedFirst and CB Financial announced that the two corporations had executed a merger agreement that, if approved by the stockholders of a majority of the outstanding shares of stock, would result in the merger of FedFirst and CB Financial.[2]  The merger agreement provided that FedFirst shareholders would receive either $23.00 in cash or 1.1590 shares of CB Financial common stock in exchange for each FedFirst share.  The FedFirst shareholders could elect to receive cash or stock, or a combination thereof, subject to the requirement in the agreement that 65% of the total shares of FedFirst would be

---

[2] At the time the amended complaint was filed, FedFirst, a Maryland corporation publicly traded on the Nasdaq Capital Market, was a savings and loan holding company headquartered in Pennsylvania.  As of March 31, 2014, FedFirst had total assets of $323.3 million and stockholders' equity of $51 million.  CB Financial is a publicly traded bank holding company incorporated and headquartered in Pennsylvania.  As of March 31, 2014, CB Financial had total assets of $550 million and shareholders' equity of $43.5 million.

exchanged for CB Financial stock and 35% would be exchanged for cash.[3]  Mr. Sutton's complaint estimated that the value of the merger was approximately $54.5 million dollars.

Pursuant to the merger agreement, FedFirst President and Chief Executive Officer Patrick G. O'Brien would become the Executive Vice President and Chief Operating Officer of Community Bank, a wholly owned subsidiary of CB Financial through which CB Financial conducted its operations.  FedFirst directors John J. LaCarte, John M. Swiatek, Richard B. Boyer, and Mr. O'Brien would join the board of directors of CB Financial.  The stockholders were advised that some of FedFirst's officers and directors obtained interests in the merger that were not shared by stockholders generally.  For example, all outstanding stock options would be terminated and the holders of the stock options would receive a cash payment equal to the number of shares multiplied by the amount by which $23.00 exceeded the "exercise price" of the stock option.  Cash payments for directors included the following: Patrick G. O'Brien (President and CEO) $446,314; Richard B. Boyer (Vice President) $193,958; Jamie L. Prah (Senior Vice President and Chief Financial Officer) $199,996; Henry B. Brown III (Senior Vice President and Chief Lending Officer) $161,862.  Cash payments to all non-employee directors (5 persons) totaled $538,708.

Moreover, the agreement accelerated the vesting of FedFirst restricted stock awards, resulting in restricted stock awards becoming "fully vested upon the occurrence of a change

---

[3] The tax consequences of the merger to each shareholder depended on the election chosen by each shareholder.

in control and each share of restricted stock will be converted into 1.1590 shares of CB common stock."[4]  Finally, with respect to Exchange Underwriters, Inc., an insurance agency in which FedFirst owned 80% equity interest and Mr. Boyer owned 20% interest, FedFirst would buy out Mr. Boyer's 20% interest prior to the closing of the merger, and Mr. Boyer would continue to be employed as Chief Executive Officer of the company following the merger.

The Merger Agreement also included covenants that protected CB Financial's interests and encouraged the completion of the merger.  Initially, FedFirst agreed that it would not initiate, solicit, or knowingly encourage any other acquisition proposals (e.g., a merger or tender offer).  The agreement, however, did not preclude FedFirst from considering unsolicited offers, as long as they were "superior proposals."  Moreover, FedFirst agreed to promptly

> notify CB of such inquiries, proposals or offers received by, any such information requested from, or any such discussions or negotiations sought to be initiated or continued with FedFirst or any of its representatives

---

[4] "Restricted Stock Unit" has been defined as:

Compensation offered by an employer to an employee in the form of company stock. The employee does not receive the stock immediately, but instead receives it according to a vesting plan and distribution schedule after achieving required performance milestones or upon remaining with the employer for a particular length of time. The restricted stock units (RSU) are assigned a fair market value when they vest. Upon vesting, they are considered income, and a portion of the shares are withheld to pay income taxes. The employee receives the remaining shares and can sell them at any time.

*Restricted Stock Unit Definition*, Investopedia, http://perma.cc/T4D7-7MZ4.

indicating, in connection with such notice, the name of such Person and the material terms and conditions of any inquiries, proposals or offers.[5]

Finally, "in order to induce CB to enter into this Agreement, and to reimburse CB for incurring the costs and expenses related to entering into this Agreement and consummating the transactions contemplated," the agreement included a termination fee of $2,750,000, which FedFirst agreed to pay in the event that it terminated the agreement.

## The S-4 Registration Statement

On June 13, 2014, CB Financial filed a Registration Statement (Form S-4) with the United States Securities and Exchange Commission ("SEC"). On July 28, 2014, CB Financial filed an amended S-4 with the SEC (hereinafter "the S-4"), which was more than 300 pages long and included a plethora of information about the companies and the proposed merger. It included, *inter alia*, the following:

- A letter to stockholders of FedFirst explaining the proposed transaction and advising that the approval of the merger agreement required the affirmative vote of the holders of a majority of the outstanding shares of FedFirst common stock.

- A summary providing a description of the two companies and the highlights of the merger.

- A detailed discussion of the risks associated with the merger (e.g., the price of CB Financial stock may decrease after the merger, and/or "FedFirst stockholders will have reduced ownership and voting interest after the merger") and risks related to CB Financial (e.g., "Changes in interest rates may reduce CB's profits and impair asset values").

---

[5] In his amended complaint, Mr. Sutton argued that this provision was one of three "preclusive deal protection mechanisms" that unduly benefitted CB Financial. He argued that the information regarding any "superior proposals" that FedFirst was to provide to CB Financial, which included the material terms of the offer, was designed to give CB Financial "matching rights," providing "CB Financial the ability to top the superior offer."

- Selected historical financial information for both companies.

- A description of the special meeting of the stockholders during which the stockholders would vote on the merger.

The S-4 also included a detailed chronological account of the negotiation of the merger. It explained that, in January 2013, Patrick G. O'Brien, President and Chief Executive Officer, of FedFirst, met with Barron P. McCune, Jr., President and Chief Executive Officer of CB, at Mr. McCune's invitation, to discuss a possible business combination of their two institutions. No price or other terms were discussed at this meeting. In February 2013, Mr. O'Brien and Mr. LaCarte met with FedFirst's financial advisor, Mufson Howe Hunter, "to examine the current [Mergers & Acquisitions ("M&A")] market in the bank and thrift industry and review the financial characteristics of a possible business combination between CB and FedFirst." In March, the FedFirst board of directors discussed the issue and "observed that there were many compelling strategic business reasons for a combination with CB, including their complementary market areas and similar corporate cultures." FedFirst did not, however, pursue a transaction with CB or any other company at that time.

In August, the following occurred:

[T]he FedFirst board of directors met to discuss its strategic alternatives. Representatives of Mufson Howe Hunter were present at the meeting, as was a representative of Kilpatrick Townsend & Stockton LLP, outside legal counsel to FedFirst. Representatives of Mufson Howe Hunter reviewed with the directors bank and thrift stock market trends; compared key balance sheet and profitability metrics of FedFirst to those of comparable companies in Pennsylvania; examined FedFirst's historical and projected financial performance; provided an update on the M&A market in the bank and thrift industry; reviewed with the directors the financial characteristics of a possible business combination between CB and FedFirst; and identified

-6-

potential acquirers of FedFirst, evaluated their likely interest, and analyzed their capacity to pay based on certain transaction assumptions. Legal counsel reviewed with the directors their fiduciary duties in the context of a business combination with another company.

In September, the FedFirst board of directors "authorized Mufson Howe Hunter to contact three selected parties regarding their interest in a possible business combination with FedFirst." It "determined that the business risks resulting from awareness in the local banking community of FedFirst's interest in a business combination outweighed the benefit of contacting additional companies that were unlikely to have the interest or ability to complete a transaction with FedFirst."

By October, FedFirst had received responses from each of the three companies. The first company (Bank A) initially indicated that it had an interest in acquiring FedFirst, but by November, Bank A lost interest in pursuing a merger with FedFirst. Because "none of the other parties considered by FedFirst were likely to be more interested in a business combination with FedFirst than CB, FedFirst decided to restart discussions with CB."

After further discussions with CB Financial, the following occurred:

> On February 14, 2014, CB provided FedFirst with a non-binding letter of interest for a business combination between the two companies. CB proposed the merger of FedFirst into CB valued at $21.80 per share of FedFirst common stock, with the exchange of 65% of the outstanding shares of FedFirst common stock for shares of CB common stock and the remaining 35% exchanged for cash. CB conditioned the transaction on FedFirst purchasing from Mr. Boyer his 20% minority interest in Exchange Underwriters prior to closing.

***

> On February 27, 2014, FedFirst delivered its mark-up of the letter of interest and communicated its view on the value of the merger consideration, which was that the merger consideration should be increased to a value of

$23.00 per share. On March 6, 2014, CB agreed to increase the value of the merger consideration to $23.00 per share, and on March 7, 2014 delivered a revised letter of interest. . . . . During the course of negotiations, the parties also discussed the method of calculating the exchange ratio and agreed that the exchange ratio would be determined at the time of signing the definitive merger agreement by dividing $23.00 by the volume-weighted average price of CB common stock over the prior 20 trading-day period. CB did not agree to FedFirst's request to reduce the termination fee from 5% of the transaction value to 4% of the transaction value, but did agree to make the termination fee reciprocal.

The directors discussed the proposal and consulted with legal counsel. They ultimately voted to accept the letter of interest, and the following occurred:

On March 28, 2014, Luse Gorman Pomerenk & Schick, PC, special counsel for CB delivered an initial draft of the merger agreement. Over the ensuing days, the parties negotiated the terms of the merger agreement and ancillary documents. In particular, the parties negotiated the various representations and warranties to be made by each of them, the terms of the covenants that restrict the activities of the parties pending completion of the merger, including the "no-shop" provision that restricts the ability of FedFirst to seek alternative transaction proposals, the treatment of various employee benefit plans and agreements, and the expense limitation on director and officer liability insurance. The parties also discussed the details with respect to the composition of CB's board of directors following the merger, agreed that CB would take action to amend its articles of incorporation to eliminate pre-emptive rights in connection with future share issuances, worked out the details with respect to the purchase of the minority interest in Exchange Underwriters, and agreed that the listing of CB common stock on the Nasdaq Stock Market would be a condition to closing.

On April l4, 2014, the FedFirst board of directors met to consider the merger agreement. Representatives of Mufson Howe Hunter presented a financial analysis of the transaction and gave its opinion that "the consideration to be received by the stockholders of FedFirst under the merger agreement [was] fair, from a financial point of view, to the

-8-

holders of FedFirst common stock." The board of directors then unanimously approved the definitive merger agreement.

That same day, on April 14, 2014, the CB Financial board of directors unanimously approved the definitive merger agreement, and the merger agreement was executed by officers of FedFirst and CB Financial. A joint press release was issued, announcing the execution of the merger agreement and the terms of the merger.

After providing the events leading to the merger, the S-4 set forth a discussion of FedFirst's reasons for the merger, stating that the FedFirst board of directors "unanimously determined that the merger agreement [was] in the best interests of FedFirst and its shareholders." The S-4 listed a number of factors considered, including:

- [the Board's] belief that the merger will result in a stronger commercial banking franchise with a diversified revenue stream, strong capital ratios, a well-balanced loan portfolio and an attractive funding base that has the potential to deliver a higher value to FedFirst's shareholders as compared to continuing to operate as a stand-alone entity;

* * *

- the expanded possibilities, including organic growth and future acquisitions, that would be available to the combined company, given its larger size, asset base, capital, market capitalization and footprint;

* * *

- [] that the value of the merger consideration for holders of FedFirst common stock at $23.00 per share, represents a premium of 15% over the $20.06 closing price of FedFirst common stock on NASDAQ on April 10, 2014, which is the most recent date on which FedFirst common stock traded prior to April 14, 2014;

- [the opinion of the independent financial advisor that the merger consideration was fair];

* * *

- [] that the merger consideration consists of a combination of CB common stock and cash and that FedFirst shareholders will be given the opportunity

-9-

to elect the form of consideration that they wish to receive, giving FedFirst shareholders the opportunity to participate as stockholders of CB in the benefits of the combination and the future performance of the combined company generally;

- [] that upon completion of the merger FedFirst shareholders will own approximately 42% of the outstanding shares of the combined company;

* * *

- the perceived limited opportunities for a strategic partnership with another financial institution, at a similar or higher price, having characteristics that would achieve the benefits for FedFirst stockholders that the board believes will be achieved through the merger with CB; [and]

* * *

- the equity interest in the combined company that FedFirst's existing shareholders will receive in the merger, which allows such shareholders to continue to participate in the future success of the combined company.

The S-4 contained further information, including the following:

- A summary of the Fairness Opinion provided by Mufson Howe Hunter & Company LLC, FedFirst's financial advisor, including the financial data upon which Mufson Howe Hunter relied to render its opinion (the full text of the Fairness Opinion was attached to the end of the S-4).

- A description of the consideration stockholders would receive in the merger, including detailed hypothetical examples regarding how the two types of consideration (cash and stocks) would be apportioned based on the potential elections of FedFirst stockholders.[6]

---

[6] The merger agreement required that 65% of all FedFirst's outstanding stock be traded for CB Financial stock, and it provided that, in the event that shareholder stock elections were oversubscribed:

[A]ll FedFirst stockholders who have elected to receive cash or who have made no election will receive cash for their FedFirst shares and all stockholders who have elected to receive CB common stock will receive a pro rata portion of the available CB shares plus cash for those shares not converted into CB common stock.

(continued . . .)

-10-

- A section discussing the "Interests of Certain Persons in the Merger that are Different from Yours," which described the unique benefits received by FedFirst's officers and directors.

- A discussion of the management of CB Financial and the roles of FedFirst's officers and directors after the merger, including detailed information about compensation and benefits.

- The Agreement and Merger Agreement (provided in full in Annex A of the S-4).

**Proceedings Below**

On April 21, 2014, Mr. Sutton filed a class action and derivative lawsuit against FedFirst, its seven individual directors, and CB Financial.[7]  Mr. Sutton asserted:

> In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control

_____

(. . . continued)

Conversely, if stock elections were undersubscribed, the agreement provided the following procedure:

> [A]ll FedFirst stockholders who have elected to receive CB common stock will receive CB common stock and those stockholders who elected to receive cash or who have made no election will be treated in the following manner:
>
> - If the number of shares held by FedFirst stockholders who have made no election is sufficient to make up the shortfall in the number of CB shares that CB required to issue, then all FedFirst stockholders who elected cash will receive cash, and those stockholders who made no election will receive both cash and CB common stock in such proportion as is necessary to make up the shortfall.
>
> - If the number of shares held by FedFirst stockholders who made no election is insufficient to make up the shortfall, then all FedFirst stockholders who made no election will receive CB common stock and those FedFirst stockholders who elected to receive cash will receive cash and CB common stock in such proportion as necessary to make up the shortfall.

[7] The seven individual directors are John J. LaCarte, Carlyn Belczyk, John M. Kish, Richard B. Boyer, John M. Swiatek, David L. Wohleber, and Patrick G. O'Brien.

or a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to act in the best interests of the company's shareholders, including the duty to obtain maximum value under the circumstances.

He alleged that the individual directors

> violated, and are violating, the fiduciary duties they owe to [Mr. Sutton] and the other public shareholders of FedFirst, including their duty of candor and duty to maximize shareholder value. As a result of the Individual Defendants' divided loyalties, [Mr. Sutton] will not receive adequate, fair or maximum value for their FedFirst common stock in the Proposed Acquisition.

Mr. Sutton also alleged, *inter alia*, that the deal included "preclusive deal mechanisms which effectively discourage other bidders from making successful topping bids," and "the Proposed Acquisition will allow CB Financial to purchase FedFirst at an unfairly low price while availing itself of FedFirst's significant value."

The first count of the amended complaint alleged a breach of fiduciary duty against the individual defendants. It asserted that the directors had

> initiated a process to sell FedFirst that undervalues the Company and vests them with benefits that are not shared equally by FedFirst's public shareholders. In addition, by agreeing to the Proposed Acquisition, Defendants have capped the price of FedFirst at a price that does not adequately reflect the Company's true value.

Mr. Sutton sought to have the court enjoin the vote on the merger, stating that the plaintiff had no adequate remedy at law.

The second count alleged that CB Financial and FedFirst aided and abetted the individual directors' breach of fiduciary duty. In that regard, it alleged that CB Financial "knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred," and as

-12-

a result, Mr. Sutton "will be damaged in that [he has] been and will be prevented from obtaining a fair price for [his] shares."

The third count sought declaratory relief. Mr. Sutton requested a declaration that: (1) the vote should be enjoined, (2) the proposed acquisition was unlawful and unenforceable and the merger agreement "and/or the transactions contemplated thereby, should be rescinded and the parties returned to their original position."

In the Prayer for Relief, the amended complaint stated, as follows:

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.     Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel and derivative counsel;

B.     Declaring and decreeing that the Proposed Acquisition was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable, and rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Acquisition;

C.     Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition;

D.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of FedFirst's shareholders;

E.     Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

On June, 19 and 20, 2014, FedFirst (the company and the individual directors) and CB Financial, respectively, filed motions to dismiss the complaint for failure to state a claim. FedFirst provided five arguments in its motion: (1) Mr. Sutton lacked standing to bring a direct claim against FedFirst's Board for breach of fiduciary duties; (2) Mr. Sutton failed to overcome the business judgment rule; (3) Mr. Sutton's allegations of omissions in the Registration Statement failed to meet Maryland's materiality standard; (4) the FedFirst Board was under no duty to maximize shareholder value; and (5) to the extent that Mr. Sutton alleged that FedFirst aided and abetted the individual directors' alleged breaches of fiduciary duties, Mr. Sutton failed to adequately allege any elements of an aiding and abetting claim against FedFirst.[8] CB Financial reiterated some of FedFirst's arguments in its motion, and it argued that, even if there was a breach of fiduciary duty by the directors of FedFirst, Mr. Sutton had not alleged any specific facts from which it could be inferred that CB Financial "knowingly participated" in such a breach.

On July 29, 2014, after CB Financial filed the S-4 with the SEC, Mr. Sutton filed an amended complaint, adding the allegation that the S-4 "omits material information about the Proposed Acquisition that must be disclosed to FedFirst's shareholders to enable them to make a fully informed decision." On August 12, 2014, FedFirst filed an amended motion to dismiss.

---

[8] FedFirst also argued that Mr. Sutton failed to make a required demand on the FedFirst Board before filing his derivative suit. Mr. Sutton ultimately dismissed his derivative claims, and therefore, the circuit court did not address this argument.

On September 2, 2014, Mr. Sutton voluntarily dismissed his derivative claim, leaving only his direct claim. On September 17, 2014, Mr. Sutton filed a motion for a preliminary injunction, requesting that the court enjoin FedFirst from holding a shareholder vote on the proposed merger. On September 18, 2014, the court heard argument on the defendants' motions to dismiss. In an order dated September 19, 2014, the circuit court dismissed Mr. Sutton's direct claims, with prejudice. On October 17, 2014, Mr. Sutton filed a Notice of Appeal.

On January 14, 2015, the circuit court issued its Memorandum Opinion. The court explained that it was granting the motions to dismiss for the following reasons: (1) Mr. Sutton "failed to assert a direct injury necessary to bring [a] direct claim" because he "failed to demonstrate how the alleged injury [was] 'separate and distinct' from that suffered from other shareholders"; (2) *Shenker v. Laureate Education, Inc.*, 411 Md. 317 (2009), "only applies in the limited context of a cash-out merger that will result in a change of control, which [was] not contemplated by the Proposed Transaction," and therefore, the case does not provide Mr. Sutton with a direct cause of action against the FedFirst Board for breach of common law duties of candor and maximization of shareholder value; (3) even if Mr. Sutton could maintain his direct claim against the FedFirst Board, his allegations were insufficient to rebut the presumptions afforded to the directors by the business judgment rule; (4) "the alleged omissions in the Registration Statement are wholly immaterial"; and (5) Mr. Sutton "failed to allege an underlying breach of fiduciary duty,"

and therefore, his "aiding and abetting claims fail as a matter of law."  On January 15, 2015, Mr. Sutton filed an amended notice of appeal.

## Post-Dismissal Events

Mr. Sutton did not move to stay the merger pending his appeal, and the parties have represented that, on October 31, 2014, FedFirst and CB Financial completed the merger.[9] On November 7, 2014, CB Financial filed a motion to dismiss the appeal as moot, arguing that, "because the merger has now occurred, there is no relief that this Court can order, rendering [Mr.] Sutton's appeal moot."  On November, 10, 2014, FedFirst filed a similar motion to dismiss, arguing that Mr. Sutton "did not move to stay the Circuit Court's order," the merger has already been completed, "FedFirst ceased to exist as an entity," "the consideration has been distributed to FedFirst shareholders," and therefore, Mr. Sutton's "appeal is moot because there is no effective remedy which this Court can provide."

On November, 21, 2014, Mr. Sutton filed an opposition to the motions to dismiss, arguing that the "consummation of the merger does not make it impossible for the trial court to grant the relief requested."  He argued that, even if the merger could not be undone, he "made clear in his complaint that he would seek damages that he . . . suffered as a result

---

[9] Pursuant to a news article that all parties referenced in their briefs, preliminary election results indicated that, of the 2,286,008 FedFirst shares outstanding, holders of approximately 21.9% of the shares elected to receive CB Financial Stock, approximately 64.0% elected to receive cash, and approximately 14.1% made no election. http://perma.cc/DPN6-PAHJ.  Because cash elections were oversubscribed (the merger agreement limited cash exchanges to 35% of FedFirst's outstanding shares), those shareholders who elected to receive cash were compensated with cash for approximately 55% of their FedFirst shares with the remainder being traded for CB Financial shares. *Id.*

of Defendants' conduct." In an order filed on December 16, 2014, this Court denied appellees' motions with leave to seek that relief in their briefs.

Additional facts will be discussed as necessary in the discussion that follows.

## DISCUSSION

## I.

### Mootness

Before addressing the merits of Mr. Sutton's claims, we address appellees' argument in their initial motions, and reiterated in their briefs, that this case should be dismissed because it is moot. "A case is moot when there is no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." *Prince George's Cnty. v. Columcille Bldg. Corp.*, 219 Md. App. 19, 26 (2014) (quoting *Suter v. Stuckey*, 402 Md. 211, 219 (2007)). "This Court does not give advisory opinions; thus, we generally dismiss moot actions without a decision on the merits." *Green v. Nassif*, 401 Md. 649, 655 (2007) (quoting *Dep't of Human Res., Child Care Admin. v. Roth*, 398 Md. 137, 143 (2007)). "In rare instances, however, we 'may address the merits of a moot case if we are convinced that the case presents unresolved issues in matters of important public concern that, if decided, will establish a rule for future conduct.'" *Roth*, 398 Md. at 143-44 (quoting *Coburn v. Coburn*, 342 Md. 244, 250 (1996)).

Appellees argue that this Court "should dismiss this appeal as moot because the only meaningful relief sought by the amended complaint – enjoining the merger – cannot be

granted because the merger has already occurred and cannot be unwound." They assert: "FedFirst's Merger into CB Financial was finalized in October 2014 and the proceeds have been distributed to the shareholders. There is nothing more that this Court can do, other than find that the appeal is moot."

If Mr. Sutton's sole claim for relief was to enjoin the merger, we would agree that the appeal was moot. In that regard, *National Collegiate Athletic Association v. Tucker*, 300 Md. 156 (1984), is instructive. In *Tucker*, two students of Johns Hopkins University filed a complaint and motion for injunction against the National Collegiate Athletic Association (NCAA), arguing that, pursuant to the NCAA's bylaws, they had not "used up one of their four seasons of eligibility for intercollegiate competition by participating in Fall lacrosse scrimmages prior to transferring to Hopkins." 300 Md. at 157. The circuit court granted the students' motion for an injunction, ordering the NCAA to allow them to play for the remainder of the season. *Id.* at 158. The NCAA noted an appeal, but by the time the case was heard by the Court, the season had ended. *Id.* The Court of Appeals dismissed the appeal, stating: "[S]imply put, the season is over. Accordingly, because the only question before us is the appropriateness of the issuance of the interlocutory injunction, we hold that the appeal is moot." *Id.* at 159.

Other cases reiterate the rule that, once the act sought to be enjoined has occurred, any appeal of the issue is moot. *See Hagerstown Reprod. Health Servs. v. Fritz*, 295 Md. 268, 271 (appeal from injunction prohibiting abortion moot where abortion performed), *cert. denied*, 463 U.S. 1208 (1983); *Banner v. Home Sales Co. D.*, 201 Md. 425, 428 (1953)

("[T]he general rule is 'that the court should confine itself to the particular relief sought in the case before it, and refrain from deciding abstract, moot questions of law which may remain after that relief has ceased to be possible.'") (quoting *Montgomery Cnty. v. Maryland-Washington Metro. Dist.*, 200 Md. 525, 530-31 (1952)).

In *Brill v. General Industrial Enterprises, Inc.*, 234 F.2d 465 (3d Cir. 1956), the Court of Appeals for the Third Circuit addressed an issue similar to the one presented here. In that case, stockholders of a corporation sought to enjoin a shareholder vote on the sale of the corporation's physical assets, asserting that the sale price was inadequate. *Id.* at 467. The trial court dismissed the complaint, and the sale occurred. *Id.* at 468. The appellate court dismissed the appeal, explaining that "an appeal from a decree dismissing a complaint seeking an injunction, or refusing to grant an injunction, will not disturb the operative effect of such a decree, and where the act sought to be restrained has been performed, the appellate courts will deny review on the ground of mootness." *Id.* at 469.[10]

Mr. Sutton recognizes these mootness principles. He concedes that he "can no longer enjoin the Stockholders' vote on the Transaction or the Closing," but he contends

---

[10] The court also rejected Brill's argument that the appellate court rule that he be permitted to file a supplemental pleading to amend the prayer for relief. *Brill v. Gen'l Indus. Enter., Inc.*, 234 F.2d 465, 470 (3d Cir. 1956). We similarly reject Mr. Sutton's argument that this Court order that he be permitted to amend his request for relief. As this Court recently explained: "[A]lthough Rule 2-341(b) is 'silent as to when a request for leave to amend may be filed,' a party may not amend the pleadings in the 'appellate court after an appealable final judgment has been entered.'" *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 184 (2015) (quoting *Bijou v. Young–Battle*, 185 Md. App. 268, 289 (2009)).

that the case is not moot because "the trial court can order the unwinding of the merger transaction or grant other relief . . . if the case is remanded." With respect to such "other relief," Mr. Sutton asserts that, although "rescission of the [t]ransaction (versus rescissory damages) is admittedly unlikely, it is plausible that, on remand, [he] will convince the Circuit Court to 'impose a constructive trust,'" in his favor "upon any benefits improperly received by [appellees] as a result of their wrongful conduct." He further asserts that, although no monetary damages claims appear in the *ad damnum* section of the complaint, there was "explicit reference to [his] claim of damages" throughout the complaint, and on remand, the court has "the power . . . to allow an award of money in the form of compensatory damages and/or rescissory damages for [a]ppellant's direct injury."[11]

---

[11] Some courts have held that there is an exception to the rule that an appeal from the demand of an injunction "is mooted by the occurrence of the action sought to be enjoined" when "a court can feasibly *restore* the status quo." *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 509 (2d Cir. 2005). *Accord Bastian v. Lakefront Realty Corp.*, 581 F.2d 685, 691 (7th Cir. 1978). *See also, Bank of New York Co. v. Northeast Bancorp, Inc.*, 9 F.3d 1065, 1066 (2d Cir. 1993) (declining to address whether there is an exception to the general rule of mootness where the appellate court feasibly can restore the status quo because, in that case, where a merger had been consummated months earlier, a stock transfer would "not restore the three companies to their pre-merger circumstances," and therefore, "rescission would not restore the *status quo*"). Mr. Sutton does not ask us to adopt such an exception to the mootness doctrine, but rather, he asserts that a remedy is available based on the relief sought in his complaint. We will confine our analysis to that argument.

**A.**

**Unwinding the Merger**

With respect to the argument that this case is not moot because the circuit court on remand could "unwind" the merger between FedFirst and CB Financial, Mr. Sutton raised this contention in his response to appellees' initial motion to dismiss the appeal, which he adopts by reference in his brief. In his brief, he concedes that this relief "is admittedly unlikely," but he has not abandoned the claim, so we will address it.

Mr. Sutton contends that, in his complaint, he requested that the court rescind the merger agreement. Accordingly, he contends his claim to rescind the agreement, and therefore any resulting merger, preserves a remedy precluding this court from dismissing this case as moot.

Neither party cites any Maryland case addressing whether, or under what circumstances, a court can "unwind" a completed corporate merger. Accordingly, we look to other courts for guidance.

Delaware courts addressing this issue repeatedly have held that, once a merger is consummated, it generally is impracticable for it to be undone.[12] For example, in *McMillan v. Intercargo Corporation*, 768 A.2d 492, 500 (Del. Ch. 2000), the Delaware Court of Chancery stated: "Having unsuccessfully attempted to obtain an injunction against the

---

[12] The Court of Appeals "has noted the 'respect properly accorded Delaware decisions on corporate law' ordinarily in our jurisprudence." *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 338 n.14 (2009) (quoting *Werbowsky v. Collomb*, 362 Md. 581, 618 (2001)).

consummation of the merger, the metaphorical merger eggs have been scrambled.  Under our case law, it is generally accepted that a completed merger cannot, as a practical matter, be unwound."  Similarly, in *In re Lukens Inc. Shareholders Litigation*, 757 A.2d 720, 728 (Del. Ch. 1999), a*ff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000), the court explained: "[P]laintiffs' demand for rescission of the transaction is plainly futile. . . . [I]t goes without saying that at this juncture it is 'impossible to unscramble the eggs.' Money damages [are] the only possible form of relief available."  *Accord Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) (concluding that a "long completed" cash-out merger was "too involved to undo"); *Coggins v. New England Patriots Football Club, Inc.*, 492 N.E.2d 1112, 1119 (Mass. 1986) (rescission of a merger is inequitable and not feasible where the merger had long been completed and "the interests of the corporation and of the plaintiffs will be furthered best by limiting the plaintiffs' remedy to an assessment of damages").

Based on this case law, it is clear that the unwinding of a long-ago completed corporate merger generally is not practicable.  Although that determination, in some cases, would be one for the trial court, several appellate courts have concluded, on the facts of the case, that rescission is not a viable remedy.  *See Bank of New York Co. v. Northeast Bancorp, Inc.*, 9 F.3d 1065, 1066 (2d Cir. 1993); *Coggins*, 492 N.E.2d at 1119.  We similarly conclude here.  In light of the representation that the agreement involved a 54.5 million dollar merger, with more than two million shares of publicly traded stock and an

integration of corporate management, that occurred almost a year ago, we hold that rescission is not a potential remedy that would preclude a finding that the appeal is moot.

## B.

### Rescissory Damages

Although rescission is not practicable, there is a possibility that, if Mr. Sutton prevailed on his claim, he could be awarded rescissory damages. In *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014), the Court of Chancery of Delaware explained: "Rescissory damages are 'the monetary equivalent of rescission' and may be awarded where 'the equitable remedy of rescission is impractical.'" (quoting *Strassburger v. Earley*, 752 A.2d 557, 579-81 (Del. Ch. 2000)). *Accord Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1144 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995). The court explained: "[T]he *Weinberger* court held that when a merger has been successfully challenged, the possible forms of monetary relief include an out-of-pocket measure of damages equal to what a stockholder would have received in an appraisal, *viz.,* the fair value of the stockholder's shares." *Orchard Enter.*, 88 A.3d at 40. Because rescissory damages in lieu of actual rescission is a possible form of relief if Mr. Sutton were to prevail on his claims, we hold that this case is not moot. Accordingly, we proceed to address Mr. Sutton's claims on the merits.

## Substantive Claims

Mr. Sutton contends that the circuit court erred in granting the motions to dismiss filed by FedFirst and CB Financial. We will address the claims with respect to each of the appellees separately. Before doing so, however, we will address the proper standard of review of a motion to dismiss and discuss generally shareholder lawsuits against corporations.

### A.

### Standard of Review

"A trial court may grant a motion to dismiss if, when assuming the truth of all well-pled facts and allegations in the complaint and any inferences that may be drawn, and viewing those facts in the light most favorable to the non-moving party, 'the allegations do not state a cause of action for which relief may be granted.'" *Latty v. St. Joseph's Soc. of Sacred Heart, Inc.*, 198 Md. App. 254, 262-63 (2011) (quoting *RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 643 (2010)). The facts set forth in the complaint must be "pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *RRC*, 413 Md. at 644.

"'We review the grant of a motion to dismiss de novo.'" *Unger v. Berger*, 214 Md. App. 426, 432 (2013) (quoting *Reichs Ford Road Joint Venture v. State Roads Comm'n*, 388 Md. 500, 509 (2005)). *Accord Kumar v. Dhanda*, 198 Md. App. 337, 342 (2011) ("We review the court's decision to grant the motion to dismiss for legal correctness."), *aff'd*,

426 Md. 185 (2012). We will affirm the circuit court's judgment "'on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised.'" *Monarc Constr., Inc. v. Aris Corp.*, 188 Md. App. 377, 385 (2009) (quoting *Pope v. Bd. of Sch. Comm'rs*, 106 Md. App. 578, 591 (1995)).[13]

**B.**

**Shareholder Suits Against Corporate Boards of Directors**

The board of directors of a corporation generally manages the business of the corporation. *Werbowsky v. Collomb*, 362 Md. 581, 598-99 (2001); *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 197 Md. App. 586, 609 (2011). Shareholders ordinarily are not permitted to interfere in the management of the company because they are owners of the company, not managers. *Werbowsky*, 362 Md. at 599; *Wasserman*, 197 Md. App. at 609.

---

[13] In addressing the motion to dismiss, the court considered the S-4, a document not included in Mr. Sutton's amended complaint. We have stated that, "where matters outside of the allegations in the complaint and any exhibits incorporated in it are considered by the trial court, a motion to dismiss generally will be treated as one for summary judgment." *Advance Telecom*, 224 Md. App. at 175. There is an exception to the general rule, however, where "a document such as the [S-4] merely supplements the allegations of the complaint, and the document is not controverted, consideration of the document does not convert the motion into one for summary judgment." *Id. Accord ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (in addressing a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"). Accordingly, the circuit court properly considered the S-4 in addressing appellees' motions to dismiss.

-25-

Corporate directors, however, do not have unlimited authority. They are subject to the fiduciary duties set forth in Md. Code (2014 Repl. Vol.) § 2-405.1 of the Corporations and Associations Article ("CA"). CA § 2-405.1(a) provides that directors must perform their duties in good faith in a manner that he or she reasonably believes to be in the best interests of the corporation, and "[w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances."[14] These duties, however, are "to the corporation and not, at least directly, to the shareholders." *Werbowsky*, 362 Md. at 599.[15]

Because director fiduciary duties relating to management do not extend to shareholders, a shareholder generally does not have a direct action against the directors, and any action taken against the directors requires the shareholder to file a derivative action. *Wasserman*, 197 Md. App. at 609-10. As the Court of Appeals explained in *Waller v. Waller*, 187 Md. 185, 189-90 (1946):

> It is a general rule that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder, though the injury may incidentally result in diminishing or destroying the value of the stock. The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish

---

[14] Md. Code (2014 Repl. Vol.) § 2-405.1(e) of the Corporations and Associations article provides that "[a]n act of a director of a corporation is presumed to satisfy the standards of subsection (a) of this section." This statutory provision codifies, with some changes, the "business judgment rule," which is a "'presumption that corporate directors acted in accordance with'" the requisite standard of care. *Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 696 (2007) (quoting *Yost v. Early*, 87 Md. App. 364, 378 (1991)).

[15] Section 2-405.1(g) provides that "[n]othing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation."

the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation. The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.

The Court of Appeals has explained a shareholder's derivative action as follows:

"The nature of the derivative proceeding is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is [a] suit by the corporation, asserted by the shareholder on its behalf, against those liable to it. The corporation is the real party in interest and the shareholder is only a nominal plaintiff. The substantive claim belongs to the corporation. . . . The proceeding is typically brought by a minority shareholder, because a majority or controlling shareholder can usually persuade the corporation to sue in its own name."

*Werbowsky*, 362 Md. at 599 (quoting 13 William Meade Fletcher et al., *Cyclopedia of the Law of Private Corporations* § 5941.10 (1995 Rev. Vol)). "In a derivative action, any recovery belongs to the corporation, not the plaintiff shareholder." *Shenker*, 411 Md. at 344.[16]

There are situations, however, where a shareholder may bring a direct action against alleged corporate wrongdoers. Such a cause of action arises "when the shareholder suffers the harm directly or a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation." *Shenker*, 411 Md. at 345. *Accord*

---

[16] Before instituting a derivative action, the plaintiff must make a demand on the corporation's board of directors to preserve the claim or demonstrate that such a demand would be futile. *Shenker*, 411 Md. at 317, 343-44. Here, FedFirst argued below that Mr. Sutton failed to follow these procedural hurdles, and Mr. Sutton subsequently dismissed the derivative claim.

*Matthews v. Headley Chocolate Co.*, 130 Md. 523, 526 (1917) (shareholders may sue directly where "they have suffered some peculiar injury independent of what the company has suffered"); *Mona v. Mona Elec. Group, Inc.*, 176 Md. App. 672, 697 (2007) (shareholder may bring direct action to enforce a right that is personal to him or her). *See also Boland v. Boland*, 423 Md. 296, 316-17 (2011) (a derivative action involves a corporate right, whereas a direct claim involves a cause of action involving a wrong against the shareholder individually).

> The Court of Appeals has explained:

> Cases where direct harm is suffered by shareholders include, for example, actions to enforce a shareholder's right to vote or right to inspect corporate records. That the plaintiff suffered his or her injury in common with all other shareholders is not determinative of whether the injury suffered is direct or indirect. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (noting that the issue of whether a claim should be brought derivatively or directly turns on considerations of who suffered the alleged harm and who would receive the benefit of any recovery); *Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002) (applying Maryland law) (noting that, in Maryland, where shareholders suffer an injury distinct from that of the corporation, rather than deriving from an injury to the business or property of the corporation, "the corporation lacks standing to sue, and Maryland's 'distinct injury' rule allows shareholders access to the courts to seek compensation directly"). Where the rights attendant to stock ownership are adversely affected, shareholders generally are entitled to sue directly, and any monetary relief granted goes to the shareholder. . . . If the plaintiff demonstrates that he or she has suffered the alleged injury directly, he or she need not make demand on the corporate board of directors or prove futility of demand, and the business judgment rule does not apply.

*Shenker*, 411 Md. at 345.

In *Shenker*, the Court addressed whether shareholders of a corporation that was purchased in a cash-out merger had a direct cause of action against the directors for failure

to maximize the amount they would receive for their shares in the transaction. The Court rejected the argument that, pursuant to CA § 2-405.1, shareholder claims against directors for breaches of fiduciary duty may be pursued only by a derivative action. *Id*. at 335-36. The Court agreed with Shenker's argument that, although § 2-405.1 addresses duties involving the management of the business of the corporation, such as the decision whether a corporation should be sold, which are enforceable only by the corporation, there are additional common law duties that are triggered once a decision to sell the corporation has been made that are personal to the shareholders and give a direct cause of action to the shareholders. *Id*. at 337. The Court of Appeals held that,

> where corporate directors exercise non-managerial duties outside the scope of § 2-405.1(a), such as negotiating the price that shareholders will receive for their shares in a cash-out merger transaction, *after the decision to sell the corporation already has been made*, they remain liable directly to shareholders for any breach of those fiduciary duties.

*Id*. at 328-29 (emphasis added). The Court held that, "in a cash-out merger transaction where the decision to sell the corporation already has been made, shareholders may pursue direct claims against directors for breach of their fiduciary duties of candor and maximization of shareholder value."[17] *Id*. at 342.

---

[17] The Court explained a cash-out merger in a footnote, as follows:

> Generally, in a cash-out (or freeze-out) merger transaction, the majority shareholder (or shareholders) of the target company seeks to gain ownership of the remaining shares in the target company. This is accomplished by incorporating an acquiring company to purchase for cash the shares of the target company. Due to the majority's controlling position in the target company, it may force any minority shareholders (continued . . .)

## C.

### The Scope of *Shenker*

The argument in the parties' briefs primarily addresses the significance of the holding in *Shenker*. Indeed, FedFirst states that "[t]his appeal turns on whether the Court of Appeals' decision in *Shenker* applies to this case."

The circuit court similarly relied on *Shenker*. In granting the motion to dismiss, the court agreed with Mr. Sutton "that under *Shenker* a shareholder may, under certain circumstances, bring direct claims against a corporation's board of directors for breaches of common law duties of candor and maximization of shareholder consideration." The court concluded, however, that Mr. Sutton's

> reliance on *Shenker* is misguided. *Shenker* only applies in the limited context of a cash-out merger that will result in a change of control, which is not contemplated by the Proposed Transaction. *Shenker* does not permit individual shareholders to bring direct claims against corporate directors for breaches of these common law duties in a non-cash-out merger transaction.

In support of its conclusion that the Court intended to so limit its holding, the circuit court pointed to footnote 3 in the Court of Appeals' opinion in *Shenker*, finding that the footnote

---

(. . . continued)

to surrender their shares and accept the cash payment, effectively eliminating their interest in the target company (and leaving them with no subsequent interest in the acquiring company). Such a cash-out merger stands in contrast to a traditional merger, in which shareholders of the target company trade in their shares in exchange for shares in the acquiring company. *See generally* James J. Hanks, Jr., *Maryland Corporation Law* § 9.5 (2006 Supp.).

*Shenker*, 411 Md. at 326 n.3.

"expressly distinguish[ed] a cash-out merger from a traditional stock-for-stock merger."

Accordingly, the court determined that Mr. Sutton did not have a claim against FedFirst, or CB Financial for aiding and abetting, with regard to a breach of the common law duties of candor and maximization of shareholder value.

Mr. Sutton argues that the circuit court's conclusion in this regard was erroneous. He asserts that the court

> erroneously held that directors of publicly traded Maryland corporations owe no common law fiduciary or other duty to maximize stockholder value and no common law fiduciary duty of candor directly to the stockholders when considering, negotiating and then recommending to the stockholders the sale of their company at a particular dollar value per share when any of the consideration those stockholders will receive for their personal property in the sale is in the form of stock in the acquiring entity.

He contends that, once the directors make the decision that the company is for sale, they act, not only as a director engaged in managing the business of the unsold corporation, but also as an agent trustee, with the non-managerial common law duty to maximize shareholder value and to disclose all material information regarding how maximization was pursued. Mr. Sutton contends that the circuit court erred in deciding that a direct action can be brought by a shareholder only "if 100% of the consideration the stockholders of the target company will receive consists of cash." He asserts that, although the Court in *Shenker* "discussed its holding numerous times in the context of the facts[,] where the

consideration was all cash, in other statements, *Shenker* expressly did not restrict its holding to cash-out transactions." [18]

FedFirst argues that "*Shenker* does not apply to this case," and therefore, "the FedFirst Board owed no duty of candor above or apart from their statutory fiduciary duties under the Maryland General Corporation Law." It asserts that the circuit court "correctly held that the Court of Appeals' decision in *Shenker* applied only in the limited context of a cash-out merger that resulted in a change of control, and that the [m]erger in this case was not a cash-out merger and there was no change in control."

Given the parties' contentions, it is clear that a thorough analysis of the decision in *Shenker* is warranted. In that case, shareholders of Laureate Education, Inc. ("Laureate"),

---

[18] Mr. Sutton also contends that the "decision of the Circuit Court has left the [s]tockholders without a remedy in violation of Maryland's Constitution." Mr. Sutton, however, did not raise this argument below, and therefore, we decline to address it. *See* Md. Rule 8-131(a) (this Court generally will not decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court"). Moreover, Mr. Sutton does not explain why, at the time he filed his amended complaint seeking to enjoin the merger, a derivative action (which he filed and voluntarily dismissed), was not available. Although we will not engage in a detailed analysis of Mr. Sutton's argument because the issue was not raised below and not adequately briefed on appeal, *see Honeycutt v. Honeycutt*, 150 Md. App. 604, 618 (when party fails to adequately brief an argument, court may decline to address it on appeal), *cert. denied*, 376 Md. 544 (2003), we do note, without deciding the issue, that at least one court has disagreed with Mr. Sutton's argument that, "once the corporation ceases to exist, as did FedFirst after the [c]losing, any derivative complaint" filed prior to the merger would have to be dismissed for standing "because the non-existent corporation could not maintain the action and the plaintiff, no longer a stockholder, could not maintain the action in the right of the corporation in which the stockholder no longer owns shares." *See Shelton v. Thompson*, 544 So.2d 845, 848-49 (Ala. 1989) (a merger resulting in the termination of a corporation did not deprive former shareholders of the defunct corporation of their derivative standing).

a publicly-held Maryland corporation, challenged a cash-out merger transaction between Laureate and several private equity investors. *Shenker*, 411 Md. at 326. The Court described the mechanics of the transaction in issue as follows:

> Laureate announced on 3 June 2007 that it accepted an increased offer from Investor Respondents to acquire Laureate at a price of $62 per share by way of a tender offer and second-step (or "short-form") merger, a process whereby Investor Respondents would purchase, at a price per share equal to the offer price, a number of newly issued shares of Laureate's common stock sufficient to provide the Investor Respondents with ownership of one share more than 90% of the total shares outstanding and then, by virtue of their 90% ownership, convert all remaining shares of Laureate's common stock into the right to receive the same price paid per share in the tender offer.

*Id.* at 331.[19]

Several shareholders objected to the deal and filed a direct lawsuit against Laureate's board of directors, arguing that the directors breached their fiduciary duties owed to the plaintiff shareholders, and the private investors aided and abetted the directors. *Id.* at 330-32. The circuit court granted Laureate's motion to dismiss on the ground that CA § 2-405.1(g) prevented a direct action against the corporate directors for alleged violations of fiduciary duties, stating that the directors' duties are owed only to the corporation.[20] *Shenker*, 411 Md. at 332. This Court affirmed, "holding that directors of Maryland corporations owe no common law fiduciary duties directly to their shareholders

---

[19] The Court noted that Shenker contended that this "tactic was designed to foreclose a shareholder vote and to ensure that Investor Respondents' acquisition of Laureate closed for the lowest price and as quickly as possible." *Shenker*, 411 Md. at 331 n.8.

[20] CA § 2-405.1(g) provides the following: "Nothing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation."

and that, in a cash-out merger transaction, any claims shareholders may have against directors for breach of fiduciary duties must be brought derivatively on behalf of the corporation." *Id.* at 333.

The Court of Appeals reversed. *Id.* at 354. Although it agreed that CA § 2-405.1(a) "governs the duty of care owed by directors when they undertake managerial decisions on behalf of the corporation," *id* at 338, it disagreed that § 2-405.1(a) was the sole source of duties owed by corporate directors, *id* at 335. The Court held "that § 2–405.1(a) does not provide the sole source of directorial duties, and that other, common law fiduciary duties of directors remain in place and may be triggered by the occurrence of appropriate events." *Id.* at 339.

The question presented in this case is what constitutes "appropriate events" that trigger common law duties of directors to shareholders. This is important because a critical factor in determining whether a shareholder has a direct, as opposed to a derivative, action against the directors is whether there is a duty to the shareholder individually.

We previously have explained that *Shenker* has "a narrow application." *Wasserman*, 197 Md. App. at 620. FedFirst agrees, but it argues that *Shenker's* holding regarding the common law duties of directors to stockholders is limited to one situation, i.e., a cash-out merger. We disagree that the decision is so limited.

To be sure, the specific holding of *Shenker* was confined to the facts of the case, "a cash-out merger transaction." *Id* at 336. The language in *Shenker* as a whole, however,

indicates that the principles set forth were not limited to that specific factual scenario.[21]

Instead, the Court held that the common law fiduciary duty of directors "may be triggered by the occurrence of appropriate events." *Id.* at 339.

In discussing the events that would trigger common law duties that give rise to a direct stockholder action, the Court focused on the scenario where corporate directors act outside their typical managerial duties after the decision is made to sell the corporation. In determining that CA § 2-405.1 did not control in that case, the Court explained:

> When directors undertake to negotiate a price that shareholders will receive in the context of a cash-out merger transaction, however, they assume a different role than solely "managing the business and affairs of the corporation." Duties concerning the management of the corporation's affairs change after the decision is made to sell the corporation. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986) (noting that, once sale became inevitable, "[t]he directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company"). Beyond that point, in negotiating a share price that shareholders will receive in a cash-out merger, directors act as fiduciaries on behalf of the shareholders. As a result of the confidence and trust reposed in them during the price negotiation, their ability to affect significantly the financial interests of the shareholders, and the inherent conflict of interest that arises between directors and shareholders in any change-of-control situation, the common law imposes on those directors duties to maximize shareholder value and make full disclosure of all material facts concerning the merger to the shareholders.

---

[21] The Court held that

where corporate directors exercise non-managerial duties outside the scope of § 2-405.1(a), *such as* negotiating the price that shareholders will receive for their shares in a cash-out merger transaction, after the decision to sell the corporation already has been made, they remain liable directly to shareholders for any breach of those fiduciary duties.

*Shenker*, 411 Md. at 328-29 (emphasis added).

-35-

*Shenker*, 411 Md. at 338-39.

The Court of Appeals noted that its decision was consistent with the Delaware Supreme Court's holding in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). The Court stated:

> In that case, the Delaware Supreme Court held that, where it is clear that the board has determined that the corporation is for sale or sale is a foregone conclusion, the duty of the directors "changed from the preservation of [the corporation] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit." *Revlon*, 506 A.2d at 182. The court noted that, at this point, the "directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.*

*Shenker*, 411 Md. at 340. The Court of Appeals explained that "*Revlon* and the duties that it described are aimed at the duties involved in a situation where sale of the corporation is a foregone conclusion and the primary remaining interests are those of the shareholders in maximizing their share value in a sale." *Id.* at 341.

The Court concluded that CA § 2-405.1 did not supersede the common law duties "in Maryland, including those characterized in *Revlon*, that, when faced with an inevitable or highly likely change-of-control situation, corporate directors owe their shareholders fiduciary duties of candor and maximization of shareholder value." *Id.* It held that, "[o]nce the threshold decision to sell Laureate was made, Board Respondents owed fiduciary duties of candor and maximization of shareholder value to Petitioners, common law duties not encompassed or superseded by § 2-405.1(a)." *Id.* Thus, pursuant to *Shenker*, the events triggering the common law duties of maximization of value and candor, which are owed to a shareholder and permit a direct action, are when "the decision is made to sell the

-36-

corporation," the "sale of the corporation is a foregone conclusion," or the sale involves "an inevitable or highly likely change-of-control situation." *Id.* at 338, 341.

The Court of Appeals did not, in *Shenker* or in any subsequent case, explain what factual scenarios satisfy the above triggering events. Accordingly, in assessing whether the FedFirst directors had duties of maximization of value and candor owed to the shareholders in the merger transaction here, we look to other jurisdictions for guidance. In particular, because the Court of Appeals relied on the Delaware Supreme Court's decision in *Revlon*, we look to the decisions of the Delaware courts.

The Delaware Supreme Court has made clear that not every corporate combination triggers a duty to maximize shareholder value. *See Paramount Commc'ns v. Time Inc.*, 571 A.2d 1140, 1151 (Del. 1989) (*Revlon* duties do not arise simply because a company is "in play' or "up for sale."). In *Time*, the court held that the Time Board did not put the corporation up for sale, or make the dissolution of the corporate entity inevitable, and therefore trigger *Revlon* duties, merely by entering into a merger agreement with Warner Communications, Inc., even where the agreement contained a "no-shop" clause and other structured safety devices to protect the agreement. *Id.*[22]

Rather, the *Revlon* duties have been held to apply in only limited circumstances. To date, *Revlon* duties have been found to apply only in the following scenarios:

---

[22] As the Delaware Supreme Court subsequently noted, the transaction that ultimately was consummated in *Time-Warner*, however, "was not a merger, as originally planned, but a sale of Warner's stock to Time." *Paramount Commc'n v. QVC Network Inc.*, 637 A.2d 34, 47 (Del. 1993).

(1) "when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company," *Paramount*[, 571 A.2d at 1150]; (2) "where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company," *id.*; or (3) when approval of a transaction results in a "sale or change of control," *[Paramount Commc'n v. QVC [Network Inc.]*, 637 A.2d [34,] 42-43, 47 [(Del. 1993)].

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1289-90 (Del. 1994). We thus address these facts in the context of the claims raised in this case.

## D.

## FedFirst

## 1.

## Applicability of *Revlon/Shenker* Duties

In assessing whether *Revlon* duties, referred to by the Court of Appeals in *Shenker*, apply to the directors in the case, we note that there is no allegation that FedFirst initiated an active bidding process or abandoned a long-term strategy to seek to break up the company. Rather, the directors merely explored options for a potential merger, which they would then present to the stockholders for approval.[23]

These facts do not support a conclusion, pursuant to *Shenker*, 411 Md. at 338, 341, that *Revlon* duties applied because "the decision [had been] made to sell the corporation"

---

[23] Pursuant to CA § 3-105, a board of directors proposing to merge the corporation submits the proposed transaction to the shareholders for approval. Directors of a corporation have a duty of loyalty to the shareholders in a merger, which typically is subject to the business judgment rule, i.e., a presumption that the officers acted in good faith and in the best interests of the corporation. *Wittman v. Crooke*, 120 Md. App. 369, 376-77 (1998).

or "the sale of a corporation [was] a foregone conclusion." *See Arnold*, 650 A.2d at 1290 (*Revlon* duties applicable to directors "seeking to sell" the corporation apply in the context of the directors "initiat[ing] an active bidding process"); *Time*, 571 A.2d at 1151 (directors did not put corporation up for sale or make dissolution of the company inevitable merely by entering into a merger agreement). The only potential rationale raised for finding a *Revlon* duty to maximize shareholder value, therefore, involves whether the transaction involved a "highly likely change-of-control situation." *Id.* at 341.

In that regard, the Delaware courts have addressed when a merger, other than a cash-out merger, constitutes a "change of control" that triggers *Revlon* duties. In *Equity-Linked Investors, LP v. Adams*, 705 A.2d 1040, 1055 (Del. Ch. 1997), the court determined that *Revlon* duties apply in a stock-for-stock merger where there is "no tomorrow for the shareholders (no assured long-term)" because the stock received is subject to the control of a single individual or associated group who has majority control over the merged entity. *Id.* By contrast, in the context of a stock-for-stock merger where control of the merged entity will remain in a large, fluid, public market, *Revlon* duties do not apply because there is no change-of-control. *See Arnold*, 650 A.2d at 1290 (No "sale or change of control" triggering *Revlon* duty to maximize value in stock-for-stock merger when "'[c]ontrol of both [companies] remain[s] in a large, fluid, changeable and changing market.'") (quoting *QVC*, 637 A.2d at 47). *Accord In re Santa Fe Pacific Corp. S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995) (plaintiff failed to state a claim that the board had a duty to seek the best value where the board was committed to a stock-for-stock merger and

plaintiff failed to allege that control of the company after the merger would not remain in a large, fluid, changing market); *Krim v. Pronet, Inc.*, 744 A.2d 523, 528 (Del. Ch. 1999) ("*Revlon* duties are not triggered when ownership remains with the public shareholders and no change of control results."). *See also* James J. Hanks, *Maryland Corporation Law*, § 6.6A at 195 ("A sale of the business for cash—whether through merger, sale of assets or otherwise—will always result in a change of control. Conversely, a stock-for-stock merger will not be a change of control so long as there is no single stockholder or affiliated group of stockholders who did not have effective voting control of the target *before* the transaction but who will hold a majority of the voting power of the combined company *after* the transaction.").

In *QVC*, the Delaware Supreme Court explained why a stock-for-stock merger does not result in a change of control where the remaining corporation is owned by a "fluid aggregation of unaffiliated voters." 637 A.2d at 46. In that regard, it noted its prior decision in *Time*, 571 A.2d at 1150, where it approved the Chancellor's conclusions regarding when a change of control occurs, as follows:

> Surely under some circumstances a stock for stock merger could reflect a transfer of corporate control. That would, for example, plainly be the case here if Warner were a private company. But where, as here, the shares of both constituent corporations are widely held, corporate control can be expected to remain unaffected by a stock for stock merger. This in my judgment was the situation with respect to the original merger agreement. When the specifics of that situation are reviewed, it is seen that, aside from legal technicalities and aside from arrangements thought to enhance the prospect for the ultimate succession of [Nicholas J. Nicholas, Jr., president of Time], neither corporation could be said to be acquiring the other. **Control of both remained in a large, fluid, changeable and changing market.**

-40-

The existence of a control block of stock in the hands of a single shareholder or a group with loyalty to each other does have real consequences to the financial value of "minority" stock. The law offers some protection to such shares through the imposition of a fiduciary duty upon controlling shareholders. **But here, effectuation of the merger would not have subjected Time shareholders to the risks and consequences of holders of minority shares. This is a reflection of the fact that no control passed to anyone in the transaction contemplated.** The shareholders of Time would have "suffered" dilution, of course, but they would suffer the same type of dilution upon the public distribution of new stock.

*QVC*, 637 A.2d at 46-47 (quoting *Paramount Commc'ns Inc. v. Time Inc.*, No. 10866 (Del. Ch. July 17, 1989)). The Court explained that a key reason behind imposing *Revlon* duties is concern regarding actions where the shareholder's voting power is diminished. *Id.* at 45.

Here, Mr. Sutton does not allege, for good reason, that control of the company after the merger would not remain in a large, fluid, changing market. Thus, the merger did not result in a "sale or change of control." *Arnold*, 650 A.2d at 1270. Unlike the scenario involved in the cash-out merger transaction in *Shenker*, FedFirst's shareholders in this case, by virtue of the stock portion of the merger agreement, have a continuing interest, including voting power, in the combined company, and they can participate in the future successes of CB Financial.[24] Accordingly, there was no "sale or change of control," and *Revlon* duties were not triggered in this case.

---

[24] To be sure, the transaction here was not a 100% stock-for-stock transaction. Rather, the merger consideration here was a mix of cash and stock. The agreement provided that 65% of FedFirst's stock be traded for CB Financial stock and 35% of the stock exchanged for cash. The parties do not argue that this fact, that the transaction was a mixed stock and cash merger, is critical to the analysis whether there was a change of control transaction implicating the *Revlon* duty to maximize value. We note, however, that in *In re Synthes, Inc. Shareholder Litigation*, 50 A.3d 1022, 1047-48 (continued . . .)

**2.**

**Direct Action By Stockholders**

Although the Court of Appeals in *Shenker* recognized an exception to the general rule that a shareholder must bring a derivative action when challenging a merger transaction, the exception was limited to situations where "the decision [was] made to sell the corporation," "the sale was a foregone conclusion," or the sale involved "an inevitable or highly likely change-of-control situation." 411 Md. at 338, 341. None of these scenarios are presented here where the directors merely entered into a merger agreement involving a stock-for-stock transaction in which the combined corporation continued to remain in a large, fluid, public market in which FedFirst's stockholders were left with a continuing interest in CB Financial.

Rather, given the circumstances of the merger agreement here, the Fedfirst directors were acting pursuant to their managerial duties, and the duties owed were those set forth in CA § 2-405.1, i.e., to perform in good faith, in the best interest of the corporation, and with the care that an ordinarily prudent person would use. With respect to those duties, the directors were entitled to the business judgment rule, which provides that the officers acted

---

(. . . continued) (Del. Ch. 2012), the Court of Chancery of Delaware held, in an almost identical situation, that where merger consideration consisted of a mix of 65% stock and 35% cash, and the stock portion involved stock in a company whose shares were held in a large, fluid market, the transaction did not result in a change of control that triggered *Revlon* duties.

in good faith and in the best interests of the corporation, and any claim regarding an alleged breach of those duties was required to be brought derivatively on behalf of the corporation.

The *Shenker* exception that allows a shareholder to bring a direct action based on the common law "non-managerial" duties of candor or maximization of value does not apply here. Accordingly, Mr. Sutton did not have a direct shareholder action against the directors, and because he dismissed his derivative action, the circuit court properly granted the motion to dismiss Mr. Sutton's claim against FedFirst and its directors.

## E.

## CB Financial – Aiding and Abetting

CB Financial argues that "the circuit court correctly held that the Amended Complaint failed to state a claim for 'aiding and abetting' against CB Financial because there was no underlying breach of fiduciary duties." We agree.

As the Court of Appeals has explained:

> One of the requirements for tort liability as an aider and abettor is that there be a "direct perpetrator of the tort." Thus, civil aider and abettor liability, somewhat like civil conspiracy, requires that there exist underlying tortious activity in order for the alleged aider and abettor to be held liable.

*Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 200-01 (1995) (citations omitted). As previously indicated, we have concluded that Mr. Sutton did not state a cognizable cause of action against the FedFirst directors for breach of fiduciary duties. Accordingly, his claim against CB Financial for aiding and abetting any such breach similarly fails.

In any event, even if the claim against the FedFirst directors survived, Mr. Sutton failed to state a claim against CB Financial. To state a claim for aiding and abetting a non-fiduciary, a plaintiff must allege, *inter alia*, facts that the aider and abettor "knowingly and substantially assist[ed] the principal violation." *Holmes v. Young*, 885 P.2d 305, 308 (Colo. Ct. App. 1994). Sufficient facts in that regard were not alleged here.

In *Shenker*, 411 Md. at 353-54, the Court of Appeals addressed a similar claim. It stated:

> The allegations made by Petitioners fail to demonstrate that the actions taken by Investor Respondents, alleged to have aided and abetted Board Respondents' breach of fiduciary duties, were anything more than "those normally attendant to a private entity pursuing the private acquisition of a public corporation." The crux of Petitioners' allegations seem to pin their claim on the restrictive nature of the merger agreement presented by Investor Respondents to Board Respondents. We fail to see how merely offering an agreement containing penalties if Board Respondents solicited or accepted competing bids for Laureate rises to the level of encouraging or inciting Board Respondents' alleged breach of their fiduciary duties.

*Id*. We similarly conclude here. Accordingly, the circuit court properly dismissed Mr. Sutton's claims against CB Financial for aiding and abetting.

**F.**

**Declaratory Action**

Mr. Sutton next contends that the declaratory judgment count in his amended complaint should not have been dismissed. He asserts that he is entitled to a written declaration of the rights of the parties.

In *Popham v. State Farm Mutual Insurance Co.*, 333 Md. 136, 158 n.2 (1993), the Court of Appeals explained that, where the circuit court is presented with an issue in a

declaratory judgment action that is also presented in another count of the complaint, resolution of the other count renders moot the need for a declaration. Here, because the circuit court resolved the issues raised in Count III, seeking declaratory relief, in Counts I and II, asserting claims against FedFirst and CB Financial, the resolution of the count seeking declaratory relief was moot. Accordingly, the circuit court properly dismissed the Amended Complaint without specifically addressing that claim.

**MOTION TO DISMISS DENIED. JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**